United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 30, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

No. 04-10297

———————————————

SHAWNE FIELDING; THOMAS BORER

Plaintiffs - Appellants,

versus

HUBERT BURDA MEDIA INC; ET AL

Defendants,

HUBERT BURDA MEDIA INC; HUBERT BURDA DIGITAL INC; BURDA MEDIA INC; BURDA PUBLICATIONS INC; BURDA ENTERTAINMENT VERLAG GMBH; HUBERT BURDA, Individually; BERTELSMANN AG; BERTELSMANN INC; GRUNER + JAHR AG; GRUNER+JAHR AG+CO KG; STERN DE GMBH; TIP-VERLAG GMBH

Defendants - Appellees.

————————————————————————————

Appeal from the United States District Court
For the Northern District of Texas

————————————————————————————

Before JOLLY, DAVIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Thomas Borer, the former Swiss ambassador to Germany, and Shawne Fielding, his wife (collectively, "appellants"), brought suit for libel, intentional infliction of emotional distress, tortious interference with prospective business relations, and civil conspiracy claims against appellees Hubert Burda Media Holding GmbH & Co. KG ("Hubert Burda Media"), Bertelsmann AG ("Bertelsmann"), and Gruner & Jahr ("Gruner") and those parties' related subsidiaries and affiliates. The district court dismissed for lack of personal jurisdiction and denied appellants' motions for further jurisdictional

1

discovery. Borer and Fielding filed this appeal. For the reasons that follow, we affirm the district court's holding that none of appellees has sufficient contacts in Texas to satisfy due process limitations on general or specific jurisdiction in the forum state.

## I. FACTS AND PROCEEDINGS

Appellants Thomas Borer and Shawne Fielding were married in April 1999. Borer, a citizen of Switzerland, was the Swiss Ambassador to Germany. Fielding, an American from Texas, is a former model and one-time winner of both the Miss Dallas and Mrs. Texas competitions. Two months after their marriage, Fielding and Borer moved into the Swiss Embassy in Berlin, where they remained until April of 2002. The couple was active in public and social life in Berlin and often the subject of media attention. During this time Fielding remained a citizen of Texas.

Appellee Hubert Burda Media owns *Bunte*, a German-language news magazine with 97% of its issues sold in Germany. Out of a total printing of 750,000 issues per week, *Bunte*'s circulation in Texas is limited to approximately seventy issues per week—forty subscribers and thirty newsstand distributors for resale. *Bunte* is published weekly by Bunte Entertainment Verlag GmbH, a German company with its principal office in Munich. Bunte Entertainment is a wholly owned subsidiary of Hubert Burda Media, of which Hubert Burda, a German citizen, is Chairman of the Board. Hubert Burda Media, Inc., a New York company with its principal place of business in New York City, provided research services to *Bunte* related to some of these articles.

Appellees Bertelsmann and Gruner own *Stern*, a German-language news magazine with 94% of its issues sold in Germany. Out of a total printing of approximately 1,000,000 issues per week, *Stern*'s circulation in Texas is limited to approximately sixty issues per week—forty subscribers and twenty newsstand distributors for resale. *Stern* is published weekly by Gruner & Jahr AG & Co. KG,

2

a German company of which Gruner & Jahr AG is a two-percent owner. Gruner & Jahr AG is itself a corporate division of Bertelsmann AG, a German corporation with its principal place of business in Gütersloh, Germany. Bertelsmann, Inc., a Delaware corporation with its principal place of business in New York City, is a wholly owned subsidiary of Bertelsmann AG.

On March 31, 2002, the Swiss tabloid *Sonntags-Blick* published an article alleging an extra-marital affair between Borer and Djamila Rowe, a European model and perfume saleswoman at a department store. The tabloid is owned and published by Ringier AG, a non-party to these proceedings. Rowe, who had provided explicit details about the alleged affair in the initial article, retracted her story approximately three months later, in early July 2002, and admitted that she had been paid and pressured to fabricate the story of the affair with Borer. The reversal by Rowe led to the resignations of the editor-in-chief and a writer for *Sonntags-Blick*. The tabloid reached an out-of-court settlement with Borer and Fielding and printed a front-page retraction under the headline, "Sorry."

Prior to the retraction, the story of the alleged affair was picked up by Hubert Burda Media's *Bunte* and Bertelsmann and Gruner's *Stern*.[1] Between April 11, 2002 and September 5, 2002, *Bunte* published seven articles relating to Fielding and Borer. The first article described the alleged affair and cast Fielding in an unflattering light, describing her as a blond with "charm and sex appeal," a gold digger, and having ridden through the Swiss embassy on a horse, in a revealing cowgirl outfit. The April 25, 2002 *Bunte* article included the most significant discussion of Fielding. It insinuated

---

[1] The story was also picked up by Hubert Burda Media-affiliated publications *Neue Woche* and *Viel Spass* as well as the Bertelsmann-affiliated publication *Tip*. None of the parties alleges that these publications are distributed in Texas. The analysis herein will address *Stern* and *Tip*, appellants' strongest cases for the exercise of jurisdiction.

that Fielding is accustomed to playing the role of wife to an unfaithful husband, and included an interview from her Texan ex-husband, Charlie Williams, who was described as abusive. This article reports where she went to college and includes information from her college yearbook. Another article from *Bunte*, from August 29, 2002, suggests that Fielding uses cocaine.

Between April 18, 2002 and March 20, 2003, *Stern* published five articles relating to the couple. On December 23, 2002, *Stern* gave Borer the dubious honor of "Affair of the Year," repeating the allegation from April and describing Fielding and Borer as "social pariahs" in Berlin. The article recounted the allegations of the affair and suggested that, despite subsequent denials by all parties involved, it had occurred.

As public scrutiny of Borer and Fielding intensified, the couple suffered negative ramifications. In April 2002, Borer was recalled to Switzerland and was stripped of his ambassadorship. Around the same time, Fielding suffered a miscarriage. In late 2002, she was advised by doctors to return to the less-stressful environment of Texas.[2] In addition to Borer's professional setbacks and Fielding's

---

[2] Fielding and Borer are vague about when and if they ever "lived" in Texas. Fielding claims to now "reside" in Texas, but it is clear that she must mean this in some technical sense, because she also states that "[w]hile living in Berlin . . . I continue[d] to be a resident of Dallas and the State of Texas." While it is undisputed that the couple owns land in Texas, Appellees note an April 30, 2002 New York Times article which stated the appellants "will stay in Germany where [Borer] will be a consultant." Borer also gave a phone interview to the New York Times "from his home in Potsdam" on July 14, 2002. Further, Fielding filed a Confirmation of Termination of Residence form with the Mayor's office in Potsdam on December 20, 2002, and such confirmations are to be filed "within two weeks" of actual termination of residence. Thus, contrary to appellants assertions, it seems that during virtually the entire time relevant to this lawsuit, Fielding and Borer appear to have been residents of Germany. *See Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) ("[T]he prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted.").

physical trauma, the couple alleges that they suffered injury to their reputation amongst their family, friends and acquaintances in Texas.

In April 2003, Fielding and Borer brought this suit in a Dallas County, Texas state district court against defendants Hubert Burda Media, Bertelsmann, and Gruner for libel, intentional infliction of emotional distress, tortious interference with prospective business relations, and civil conspiracy claims. Defendants removed this diversity action to the United States District Court for the Northern District of Texas under 28 United States Code Section 1332(a)(3). On June 18, 2003, Plaintiffs filed a motion for an extension to conduct additional jurisdictional discovery, which the district court granted, allowing until September 5, 2003. Plaintiffs filed a motion for a second extension to conduct further jurisdictional discovery and to amend their complaint. Defendants moved to quash these motions to extend and to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The district court granted the defendants' motions on February 11, 2004, and Fielding and Borer now timely appeal.

## II. DISCUSSION

The district court determined that it lacked specific jurisdiction over the defendants based on the publication of the alleged libels in Texas and general jurisdiction over the companies based on their contacts in the forum.

**A. The district court lacked specific jurisdiction over each appellee.**

1. Standard of Review

We review *de novo* the determination by a district court of its lack of personal jurisdiction over a defendant. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). Plaintiffs bear the burden of proving the district court's personal jurisdiction, but relevant factual disputes will be resolved in

plaintiffs' favor. *Id.*; *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 626 (5th Cir. 1999). Plaintiffs need only plead a *prima facie* case for personal jurisdiction. *Felch v. Transportes Lar-Mex S.A. De CV*, 92 F.3d 320, 326 (5th Cir. 1996). "Although jurisdictional allegations must be accepted as true, such acceptance does not automatically mean that a *prima facie* case for specific jurisdiction has been presented." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

2. State of the Law

A federal district court hearing a case in diversity may exercise personal jurisdiction to the extent permitted for a court under applicable law of the state in which the federal court sits. *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997). Texas's jurisdictional statute is a "long-arm" statute, extending the personal jurisdiction of Texas court to the extent allowed by the Due Process Clause of the Fourteenth Amendment, which "operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *see also* TEX. CIV. PRAC. & REM. CODE § 17.042 (Vernon 1997); *Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992). Due process in the exercise of personal jurisdiction requires "minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Specific jurisdiction for a suit alleging the intentional tort of libel exists for (1) a publication with adequate circulation in the state, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773–74 (1984), or (2) an author or publisher who "aims" a story at the state knowing that the "effects" of the story will be felt there. *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). Both *Keeton* and *Calder*

6

involve publications with significant levels of circulation in the state where a plaintiff sought to bring suit. *Keeton*, 465 U.S. at 772 (between 10,000 to 15,000 copies of Hustler distributed to New Hampshire per month); *Calder*, 465 U.S. at 785 (600,000 copies out of a total circulation of 5 million of the National Enquirer distributed to California per month). The Court concluded in *Keeton* that jurisdiction was satisfied because that amount of circulation could not "be characterized as random, isolated, or fortuitous." 465 U.S. at 774.

While *Keeton* jurisdiction demands substantial circulation that is lacking here, *Calder* jurisdiction requires a case-by-case analysis of the purpose and impact of the publication in question. The *Calder* Court set forth an "effects" test that looked to the various impacts of the allegedly libelous act:

> The . . . story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

465 U.S. at 788–89. The Court held further that effects alone are insufficient to establish jurisdiction, but that the defendants had directed their actions towards the forum, and knew their effects would be felt there. *Id*. at 789–90. Our Circuit has underscored the importance of the direction of defendants' action in the scheme of purposeful availment. *See, e.g.*, *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999); *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997).

Courts have extended specific jurisdiction under *Calder* over libel claims against publications with far fewer contacts in the forum state than had the *National Enquirer* in that case. *See, e.g.*, *Gordy v. The Daily News*, 95 F.3d 829, 834–35 (9th Cir. 1996) (extending jurisdiction to paper with

7

thirteen daily and eighteen Sunday papers in forum). The *Daily News* and one of its columnists allegedly libeled Berry Gordy, the founder of Motown Records and his suit landed in California federal court. The Ninth Circuit determined that the *Daily News* could reasonably anticipate being haled into court in California based on Gordy's undisputed presence in California, the *Daily News*'s regular and comprehensive contacts with the forum state, and its (albeit limited) distribution of its publication in the state. *Id*. at 833–35 (relying primarily on *Calder*, 465 U.S. at 789–90). Importantly, the Court observed that "[i]t is not clear why the distribution of 13 to 18 defamatory copies of a column loses magnitude as a contact simply because the *Daily News* does a lot of other things elsewhere." *Id*. at 834 (discounting the relevance of defendants' declaration that only .0017% of its circulation was to the forum state).

This Court has held that, to exercise specific jurisdiction in a libel action, the "aim" of the plaintiff under the *Calder* test must be demonstrated by showing that (1) the subject matter of and (2) the sources relied upon for the article were in the forum state. *Revell*, 317 F.3d at 474 & n.48 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1120 (6th Cir. 1994)). In *Revell*, Oliver "Buck" Revell sued Hart G.W. Lidov in Texas after Lidov alleged on a Columbia University website that Revell had some foreknowledge of the bombing of Pan Am Flight 103 in Scotland in 1988. *Id*. at 469. After concluding that the "effects" were felt in the forum due to the plaintiff's presence in Texas, *id*. at 473, the Court concluded that the allegations were inadequately "directed" to Texas to satisfy minimum contacts under *Calder*. *Id*. at 475. The Court held that "the sources relied upon and activities described in an allegedly defamatory publication should in some way connect with the forum if *Calder* is to be invoked." *Id*. at 474.

3. Personal Jurisdiction over Hubert Burda Media

8

Hubert Burda Media argues that, even considering all of the acts of the Hubert Burda Media-affiliated organizations, the company has insufficient contacts with Texas to satisfy due process limitations on personal jurisdiction. Hubert Burda Media's only publication with a demonstrated physical circulation in Texas is *Bunte*, with a Texas distribution of seventy issues per week, out of a total weekly printing of approximately 750,000 issues. This level of circulation does not to rise to the "substantial number of copies . . . regularly sold and distributed" requirement of *Keeton*. 465 U.S. at 781. Because Hubert Burda Media has insufficient circulation to satisfy jurisdiction under *Keeton*, its contacts must be analyzed in terms of the *Calder* effects test.

The clear focus of the seven *Bunte* articles was the alleged affair between Borer and Rowe and its aftermath, activities which occurred in Germany and Switzerland. The unflattering descriptions, references to her college years and modeling career in Texas, and the interview with her ex-husband served merely to supply background, biographical information about Fielding. While Hubert Burda Media acknowledges the use of Texas sources in conducting its research for these articles, the clear thrust of the articles, as merely echoing the affair allegations of the Swiss tabloid, *Sonntags Blick*, shows the marginal importance of this Texas research. Hubert Burda Media's forum contacts in the research process were limited to conducting interviews with Texas citizens, including Fielding's ex-husband, and hiring a contractor to purchase a copy of a college yearbook. These fleeting contacts led to no new substantial disclosures and supplied little more than the biographical backdrop for their story's protagonist. Unlike *Calder* where California was the focal point of the defamatory story, Hubert Burda Media's references to Texas were merely collateral to the focus of the articles. 465 U.S. at 789.

9

Looking to the effects caused by the allegedly libelous articles, it is clear that the articles concerned the German activities of individuals in Germany. The series of articles impugned the professionalism of a diplomat and his wife whose careers were centered in Europe, not Texas. Neither Borer's termination nor Fielding's miscarriage occurred in Texas. The brunt of the harm, in terms of appellants' injury to their professional reputations and their emotional distress, was suffered in Germany, not Texas. In sum, Germany is the focal point both of the story and of the harm suffered. Jurisdiction over Hubert Burda Media is therefore improper based on 1) the clear German audience aim of this series of articles and 2) the primarily European effects which resulted.

Further, while the bulk of the effects need not be suffered in the forum to establish jurisdiction, this Court noted in *Revell* that "knowledge of the particular forum in which a potential plaintiff will bear the brunt of the harm forms an essential part of the *Calder* test." *Revell*, 317 F.3d at 475. Knowledge that sufficient harm would be suffered in Texas is conspicuously lacking. In addition to reporting German activities of German residents, the *Bunte* articles were directed at a German audience, as demonstrated by the fact that all of the articles were published in the German language, and 97% of the magazine's issues were sold in Germany.

Moreover, the plaintiff's mere residence in the forum state is not sufficient to show that the defendant had knowledge that effects would be felt there; a "more direct aim is required." *Revell*, 317 F.3d at 476. Here, Fielding and Borer have not even proven that they did, in fact, ever reside in Texas during any of the time relevant to this suit. Thus, Hubert Burda Media's conduct and connection with the forum was not such that it should have "reasonably anticipate[d] being haled into court there." *Id.* at 475.

4. Personal Jurisdiction over Bertelsmann and Gruner

10

Gruner, a Bertelsmann affiliate, publishes *Stern*, which printed an article recounting the affair allegations in late December of 2002. Sixty copies of this publication were purposefully sent to readers in Texas. Although this article rehashed the tawdry allegations against Borer, its focus clearly was on activity that occurred in Germany. In fact, the forum state is never mentioned, other than one line noting that Fielding was "Miss [sic] Texas."[3] The articles did not discuss Fielding's past (or future) in Texas, nor did it contain any information that was available only from Texas or Texas sources.

Appellants argue that as a result of the articles, their reputations were destroyed amongst the people in Texas who knew them, even though appellants neither lived in nor had careers in Texas during the relevant time period. To employ this approach would turn the jurisdictional analysis on its head, focusing attention not on where the alleged tortfeasor directed its activity, but on where the victim could identify tangential harms. Such a flexible approach to the *Calder* effects test would contravene "traditional notions of fair play." *Int'l Shoe*, 326 U.S. at 316. An alleged tortfeasor must have some control over the jurisdiction of his alleged tort, either through his intentional availment of the economic benefits of the forum, as in *Keeton*, 465 U.S. at 774–75, or through his direction of his allegedly tortious activities towards the forum, such that the impact of the injury on the plaintiff and subsequent exercise of jurisdiction by the courts is reasonably anticipated, as in *Calder*. 465 U.S. at 789–90.

5. Conclusion

Courts have held that the absence of significant circulation is unimportant where the plaintiff can demonstrate that the brunt of the harm will occur in the forum. *See Gordy*, 95 F.3d at 834.

---

[3] Fielding was *Mrs.* Texas.

Here, Fielding and Borer have shown neither significant circulation nor certain harm in the forum state. The brunt of the harm of the alleged libel was not suffered in Texas and the publishers did not meaningfully direct their activities toward Texas. The district court correctly concluded that it lacked specific jurisdiction.

**B. The district court did not abuse its discretion by denying appellants' request for additional discovery.**

1. Standard of Review

The discovery decisions of the trial judge are reviewed for abuse of discretion. *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 918 (5th Cir. 1992). A district court's discovery decision will be reversed only if it is "arbitrary or clearly unreasonable," *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986), and the appellant demonstrates prejudice resulting from the decision. *Hastings v. N. E. Indep. Sch. Dist.*, 615 F.2d 628, 631 (5th Cir. 1980).

2. Analysis

Fielding appeals the district court's decision to cut off discovery on the issue of "whether all constituents of the massive Burda enterprise and the massive Bertelsmann enterprise, assuming each constituent was a separate entity, were subject to the District Court's specific and general jurisdiction under the single business enterprise and alter ego theories of jurisdiction." Because we conclude above, as did the district court, that the district court lacks specific jurisdiction over any of the parties, the specific jurisdiction aspect of this argument will not be addressed. The remaining issue is whether further jurisdictional discovery could demonstrate that a Texas court's general jurisdiction over some subsidiary or division of the defendant corporations might extend jurisdiction to the company as a whole.

12

A district court may exercise general jurisdiction over an out-of-state corporation under the single business enterprise doctrine when a subsidiary of the out-of-state corporation is subject to the court's general jurisdiction. *El Puerto De Liverpool v. Servi Mundo Llantero S.A. De C.V.*, 82 S.W.3d 622, 636 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) ("[J]urisdiction in Texas can be affirmed on the single business enterprise theory."). Typically used in the context of liability, the doctrine applies "when corporations are not operated as separate entities, but integrate their resources to achieve a common business purpose." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999). The Court analyzes a number of factors to determine whether a single business enterprise is present. *See El Puerto*, 82 S.W.3d at 637.

The district court determined that appellants' only evidence relevant to extending the district court's general jurisdiction was that Bertelsmann Media Group ("BMG"), a subsidiary of Bertelsmann, Inc., has a registered agent capable of receiving process in Texas. Appellants do not contest the declaration of Jacqueline Chasey, the Senior Vice President for Legal Affairs at Bertelsmann, Inc., which asserts that Bertelsmann, Inc. has no "substantial, continuous, and systematic contacts with the State of Texas." Because the registration of an agent for receipt of process does not establish general jurisdiction, *see, e.g.*, *Wenche Seimer v. Learjet Acquisition Corp.*, 966 F.2d 179, 181–82 (5th Cir. 1992), appellants have not shown how any further inquiry into the relationship between BMG and Bertelsmann, Inc. would impact the district court's jurisdictional determination.

Appellants sought further discovery to determine whether the court could exercise general jurisdiction through the single business enterprise doctrine over Bertelsmann, Inc. due to general jurisdiction over BMG. Because they failed to argue that the district court would have general

13

jurisdiction over BMG, appellants cannot show that they were prejudiced by the district court's refusal to allow them to pursue the discovery. Moreover, appellants have not made even a preliminary showing of jurisdiction. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir., 2003) ("If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained.") (internal quotations and citation omitted). The district court did not abuse its discretion.

## III. CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.