# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00576-CV

**Dr. Andrew J. Wakefield, MB, BS, Appellant**

**v.**

**The British Medical Journal Publishing Group, Ltd.;
Brian Deer; and Dr. Fiona Godlee, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. D-1-GN-12-000003, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## O P I N I O N

Dr. Andrew Wakefield appeals the trial court's order granting special appearances filed by the British Medical Journal Publishing Group, Ltd., Brian Deer, and Dr. Fiona Godlee (collectively, the Defendants) and dismissing Wakefield's defamation suit. Because we conclude that the Defendants did not waive their special appearances and that the trial court did not err in concluding that the Defendants had insufficient contacts with Texas, we affirm the trial court's order.

## BACKGROUND

In January 2012, Wakefield, a British-born and British-trained medical doctor, filed suit against the Defendants in Travis County, Texas, his residence at the time of filing. In his original petition, Wakefield claims that the Defendants committed defamation in connection with

several articles published in the *British Medical Journal*.[1]  The articles, authored by Deer and edited

by Godlee, purport to describe inaccuracies in a paper authored by Wakefield and published in

1998 in a United Kingdom medical Journal, the *Lancet*.[2]  According to Wakefield's original petition,

the 2011 articles "contained unfair, incorrect, inaccurate and unjust criticisms of findings previously

reported by Dr. Wakefield and 12 other co-authors."

Acknowledging that none of the Defendants are residents of Texas, Wakefield

pleaded in his petition that the trial court had personal jurisdiction pursuant to the Texas Long-Arm

Statute, consistent with the requirements of due process, for two reasons.  First, Wakefield alleged

that "the Defendants purposefully availed themselves of the privileges, benefits, advantages, and

profits of conducting their affairs in the State of Texas by directing a significant and regular flow of

publications . . . to institutional and individual residents of this State."  Second, Wakefield pleaded

that "[the Defendants] committed a tort, . . . in whole or in part, in this State [by] authoring, editing

and approving articles and making statements with knowledge or intent that said articles be

published and statements be made and directed to the residents of this State."

The Defendants responded to the suit by filing special appearances challenging

the trial court's personal jurisdiction over them.  *See* Tex. R. Civ. P. 120a (allowing nonresident

defendant to specially appear for limited purpose of challenging personal jurisdiction).  Later, the

---

[1]  The first article, published on January 5, 2011, is titled "Secrets of the MMR Scare; How the Case Against the MMR Vaccine Was Fixed."  Two additional articles, published on January 5 and 6, are titled, respectively, "Wakefield's Article Linking MMR Vaccine and Autism was Fraudulent" and "Editor's Choice:  The Fraud Behind the MMR Scare."

[2]  The article, which Wakefield refers to as the "the *Lancet* Paper," was published in 1998 and, generally, concerns the measles, mumps, and rubella (MMR) vaccine and its alleged connection to the development of autism in young children.

Defendants filed a motion to dismiss pursuant to the Texas Citizens Participation Act, Texas's anti-SLAPP statute.[3]  *See* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.  The Defendants' motion to dismiss states that it is made "[s]ubject to and without waiving the Defendants special appearance."  A hearing on the Defendants' special appearances was set for April 12, and a hearing on their motion to dismiss was set for April 26.

On April 12, at the hearing on the Defendants' special appearances, Wakefield asserted that the Defendants had waived their special appearances by filing their anti-SLAPP motion to dismiss.  In addition, Wakefield asserted that while he believed he had presented sufficient evidence establishing personal jurisdiction, the trial court should, in the alternative, postpone the hearing on the special appearances and allow discovery on the jurisdictional issues.

That same day, Wakefield filed a motion to strike setting and motion for continuance of the April 26 hearing on the Defendants' anti-SLAPP motion to dismiss.  At the hearing on Wakefield's motion to strike, also heard on April 12, Wakefield argued that Appellees had waived their anti-SLAPP motion to dismiss by failing to set it for a hearing within the statutorily

---

[3]  The anti-SLAPP statute (Strategic Lawsuits Against Public Participation) was enacted in 2011 and amended in 2013, after this lawsuit was filed.  *See* Act of May 24, 2013, 83d Leg., R.S., ch. 1042, § 4, 2013 Tex. Sess. Law Serv. 2499 (codified at Tex. Civ. Prac. & Rem. Code § 51.014); Act of May 24, 2011, 82d Leg., R. S., ch. 341, § 2, 2011 Tex. Sess. Law Serv. 961 (codified, as amended, at Tex. Civ. Prac. & Rem. Code §§ 27.001-.011).  Unless otherwise noted, we will cite to the current version of the statute for convenience.

The anti-SLAPP statute allows a party to achieve early dismissal in a legal action based on, related to, or filed in response to his exercise of first amendment rights by filing a motion to dismiss. Tex. Civ. Prac. & Rem. Code § 27.003.  If the motion to dismiss is granted, the court must award the moving party court costs, reasonable attorney's fees, and other expenses, as well as sanctions. *Id*. § 27.009.

3

required time frame. *See id*. § 27.004. Alternatively, Wakefield requested that the trial court grant a continuance of the April 26 hearing on the Defendants' anti-SLAPP motion to dismiss so that he could conduct discovery on the claim. *See id*. § 27.006(b) (providing that, on showing of good cause, court may allow specified and limited discovery relevant to motion to dismiss).

The Defendants opposed Wakefield's request to continue the April 26 hearing on their anti-SLAPP motion to dismiss. The Defendants also disputed Wakefield's claim that discovery was necessary on the motion to dismiss. Eventually, the trial court rejected Wakefield's argument that the Defendants had waived their special appearances and their anti-SLAPP motion to dismiss. However, the trial court granted Wakefield's request for discovery related to both personal jurisdiction and the Defendants' anti-SLAPP motion. The hearing on the special appearances was eventually reset for July 30, and the hearing on the anti-SLAPP motion was reset for July 31.

At the hearing on the Defendants' special appearances, Wakefield again argued that the Defendants had made general appearances in the case and thus had waived their special appearances. On August 3, 2012, the trial court signed an order granting the Defendants' special appearances and dismissing Wakefield's claims. No hearing was ever held on the Defendants' anti-SLAPP motion to dismiss.

In two issues on appeal, Wakefield argues that the trial court erred in granting the Defendants' special appearances. In his third issue on appeal, Wakefield argues that the trial court erred in refusing to strike a hearing setting on the Defendants' motion to dismiss because, according to Wakefield, the Defendants violated the statutory deadline for having their motion to dismiss heard. *See id*. § 27.004(b).

4

**STANDARD OF REVIEW**

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the personal jurisdiction of a Texas court. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When this burden is met, the burden shifts to the nonresident to negate all bases of personal jurisdiction asserted by the plaintiff. *Id*. A defendant may negate jurisdiction on a legal basis by showing that even if the plaintiff's allegations are true, they do not establish jurisdiction. *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). A defendant may also negate jurisdiction on a factual basis by introducing evidence that rebuts the allegations in the pleadings. *Id*.

The determination of whether a court has personal jurisdiction over a defendant is a question of law. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). When, as in this case, the trial court does not issue findings of fact and conclusions of law, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software*, 83 S.W.3d at 795. When the appellate record includes the reporter's record and clerk's record, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id*. When the trial court's findings are supported by sufficient evidence, or when the material facts are undisputed, we review the trial court's ruling on a special appearance de novo. *Baker Hughes Inc. v. Brooks*, 405 S.W.3d 246, 249 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

**DISCUSSION**

**Law governing waiver of special appearance**

In his first issue on appeal, Wakefield contends that we must reverse the trial court's order because the Defendants waived their special appearances by generally appearing in the case.

Rule 120a of the Texas Rules of Civil Procedure allows a nonresident defendant to enter a special appearance in a Texas court for the limited purpose of challenging the court's jurisdiction "over the person or property of the defendant."[4] Tex. R. Civ. P. 120a(1). A nonresident defendant contesting personal jurisdiction under Rule 120a must carefully comply with the Rule's terms in order to avoid entering a general appearance and, consequently, waiving the jurisdictional challenge. Among other things, a special appearance must be "made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion." *Id.* This is sometimes referred to as the due-order-of-pleading requirement. *See First Oil PLC v. ATP Oil & Gas Corp.*, 264 S.W.3d 767, 777 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)(discussing due-order-of-pleading requirement and due-order-of-hearing requirement). Rule 120a also contains what is known as the due-order-of-hearing requirement. *Id.* Under this requirement, the special appearance must "be heard and determined before a motion to transfer venue or any other plea or pleading may be heard."

---

[4] Prior to Rule 120a, any appearance by a defendant was a general appearance and thus subjected the defendant to the jurisdiction of the court. *Kawasaki Steel Corp. v Middleton*, 699 S.W.2d 199, 201 (Tex. 1985). Thus, a nonresident defendant had only two options—either appear and consent to jurisdiction or allow a default judgment to be taken and collaterally attack the Texas judgment as void. *Id.*; *see Atchison, Topeka & Santa Fe Ry. Co. v. Stevens*, 206 S.W. 921, 921 (Tex. 1918). By allowing a nonresident defendant the opportunity to appear prior to judgment for the purpose of contesting jurisdiction, the promulgation of Rule 120a alleviated this dilemma. *Kawasaki Steel*, 699 S.W.2d at 201.

6

Tex. R. Civ. P. 120a(2). Thus, the nonresident defendant may file other motions subsequent to a special appearance without entering a general appearance, as long as the defendant does not set and argue the motions before the special appearance is determined.

This does not mean, however, that every matter filed in violation of the due-order-of pleading requirement or heard in violation of the due-order-of-hearing requirement necessarily constitutes a general appearance. *See Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 306 (Tex. 2004) (holding that Rule 11 agreement filed before special appearance did not waive special appearance). In *Dawson-Austin v. Austin*, 968 S.W.2d 319, 321-22 (Tex. 1998), the Texas Supreme Court clarified that a general appearance does not occur unless the nonresident (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts than an action is properly pending, or (3) seeks affirmative relief from the court. The test for a general appearance is whether a party requests affirmative relief inconsistent with an assertion that the trial court lacks jurisdiction. *Id*. at 322.

**Waiver analysis**

In this case, there is no dispute that the Defendants' anti-SLAPP motion to dismiss complies with the due-order requirements of Rule 120a—the motion was filed subsequent to the Defendants' special appearances and has yet to be heard and determined on the merits. Nevertheless, Wakefield contends that the Defendants waived their special appearances by "substantially participating in the presentation and prosecution of their own [anti-SLAPP] claims prior to the resolution of their special appearances."

Although not expressly raised by the Defendants, we note at the outset that the anti-SLAPP statute suggests that a defendant may be able to maintain its right to challenge personal jurisdiction under Rule 120a while simultaneously pursuing its rights under the anti-SLAPP statute. Section 27.011 of the anti-SLAPP statute provides that the statute "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case or common law or rule provisions." Tex. Civ. Prac. & Rem. Code § 27.011. This provision appears to undermine most, if not all, of Wakefield's waiver arguments. However, even assuming that actions taken by a defendant under the anti-SLAPP statute could, conceivably, constitute a waiver of a defendant's special appearance, after considering each action challenged by Wakefield as waiver and applying the *Dawson-Austin* framework, we conclude that no such waiver has occurred in this case.

First, Wakefield argues that the Defendants entered general appearances by requesting and obtaining a complex-case assignment for their anti-SLAPP motion to dismiss under Rule 2.6 of Travis County Local Rules. Local Rule 2.6 provides, in part, that "if a party or parties believe that a case, or part of a case, has unusual characteristics that make it particularly suitable for assignment to one judge, the party or parties jointly may request the Local Administrative Judge to assign the case to one judge." Travis Cnty. (Tex.) Dist. Ct. Local R. 2.6. In the absence of a case assignment under Rule 2.6, most civil cases in Travis County are assigned to a central docket, and each hearing in the case may be heard by any judge. *See id.* R. 1.2, 1.3.

Applying the *Dawson-Austin* definition of a general appearance, we conclude that the Defendants' request for a single judge under Local Rule 2.6 did not operate as a waiver of their special appearances. The purpose of the request was to prevent the waste of judicial resources by

8

dispensing with the need for a different judge to familiarize himself or herself with the background of the case each time an issue in the case arose and by coordinating the scheduling of the interrelated proceedings.[5] The Defendants' request for a single judge did not to seek to invoke the judgment of the court or to obtain affirmative relief inconsistent with its claim that the court lacked jurisdiction over the dispute. *See Dawson-Austin*, 968 S.W.2d at 322. Rather, the request simply recognized that if and when any disputed issues in the case should arise, it would be more efficient to have all these issues decided by the same judge. The request does not recognize that the action is *properly* pending, only that it is, in fact, pending. *See Exito Elecs. Co.*, 142 S.W.3d at 306.

Second, Wakefield contends that the Defendants waived their special appearances by requesting to continue the hearing on their anti-SLAPP motion to dismiss from May to July. In response, the Defendants dispute Wakefield's characterization of the procedural events leading to the change in setting and contend that, under the circumstances, the change did not result in a general appearance by the Defendants. According to the Defendants, the hearing on their special appearances and the hearing on their anti-SLAPP motion to dismiss were reset upon the agreement of the parties and did not require any affirmative relief from the trial court. Further, the Defendants contend that the need to continue the hearings arose from the fact that the court-ordered discovery, requested by Wakefield, could not be completed before the hearings.

As previously explained, the hearing on the Defendants' anti-SLAPP motion and the hearing on Defendants' special appearances were originally scheduled for April, but were

---

[5] For example, prior to the Defendants' Rule 2.6 request being granted, Wakefield filed a motion for continuance of the initial hearing on the Defendants' anti-SLAPP motion and set it for a hearing on the same day as the initial setting on Defendants' special appearances.

rescheduled for May after Wakefield requested that he be allowed to conduct additional discovery on both issues. In addition, the record shows that the special-appearances hearing and anti-SLAPP motion-to-dismiss hearing were again reset and renoticed for June 30 and 31, respectively. However, there is no indication that the change in settings was requested by the Defendants or otherwise required any intervention by the trial court.[6] Further, there is no indication that the hearing on the anti-SLAPP motion was delayed for the purpose of furthering—as opposed to simply deferring—a decision from the trial court on the Defendants' anti-SLAPP motion. *See Dawson-Austin*, 968 S.W.2d at 323 (explaining that defendant's motion for continuance asking trial court to defer action on all matters was not general appearance); *cf. Branckaert v. Otou*, No. 01-08-00637-CV, 2011WL 3556949, at *3 (Tex. App.—Houston [1st Dist.] Aug. 11, 2011, no pet.) (mem. op.) (concluding that motion for continuance so that defendant could obtain DNA testing to disprove paternity was general appearance because it "indicated [the defendant's] intention to defend the case on the merits"). In the absence of a request to postpone made for the purpose of furthering the merits of the Defendants' anti-SLAPP motion to dismiss, we cannot conclude that the Defendants sought any affirmative action from the trial court or invoked the judgment of the trial court on an issue other than jurisdiction with respect to the trial court's resetting of the hearing.

Next, Wakefield contends that the Defendants entered general appearances by participating in discovery not limited to personal jurisdiction. Rule 120a provides that "[t]he

---

[6] A request to delay or postpone a hearing in a case is a motion for continuance. *See* Tex. R. Civ. P. 251. Generally, motions for continuance must be in writing and supported by affidavit. *Id*. Here, the record does not demonstrate that the Defendants requested, either orally or in writing, to have the hearings postponed.

issuance of process for witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of such special appearance." Tex R. Civ. P. 120a(1). Based on this language, several courts of appeals have held that the participation in discovery processes on issues unrelated to the special appearance does not constitute a special-appearance waiver. *Horowitz v. Berger*, 377 S.W.3d 115, 123 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Silbaugh v. Ramirez*, 126 S.W.3d 88, 93 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Case v. Grammar*, 31 S.W.3d 304, 311 (Tex. App.—San Antonio 2000, no pet.), *disapproved on other grounds by BMC Software,* 83 S.W.3d at 789. Although this Court has never addressed the issue, we need not decide whether a nonresident defendant may, in all instances, participate in discovery unrelated to his special appearances without risk of waiver. Even if participation in discovery may constitute a waiver in some circumstances, we disagree that the Defendants waived their special appearances by participating in discovery in this case.

Nothing in the record suggests that the Defendants, either orally or in writing, ever requested permission from the trial court to conduct discovery. Rather, the record shows that the Defendants repeatedly opposed Wakefield's requests for discovery and only participated in the discovery processes once the trial court ordered the discovery. In these circumstances, we cannot conclude that, by complying with the trial court's order to participate in discovery, the Defendants sought affirmative relief inconsistent with their assertion that the trial court lacked jurisdiction over the suit. *See Dawson-Austin*, 968 S.W.2d at 322.

Finally, Wakefield argues that the Defendants waived their special appearances by requesting and obtaining a briefing schedule that required Wakefield to respond to the Defendants'

11

anti-SLAPP motion before a determination of their special appearances. In response, the Defendants contend that they simply requested a briefing schedule that would allow the trial court the "opportunity to digest the parties' legal arguments, consider the evidence, and focus the hearing on those issues for which oral argument would provide meaningful assistance."[7] In other words, if the trial court denied the Defendants' special appearances, such that a hearing on the Defendants' anti-SLAPP motion became necessary, the Defendants requested that Wakefield be required to file a response to the anti-SLAPP motion a reasonable amount of time before the hearing.

There is nothing in the record demonstrating that the Defendants specifically requested that the trial court order Wakefield to respond to their anti-SLAPP motion prior to the hearing on their special appearances. Rather, in granting Wakefield's request for additional discovery, the trial court, on its own, set the Defendants' special appearances and anti-SLAPP motion to dismiss for hearings on May 22 and 23, respectively. Then, as previously discussed, the hearings were reset for July 30 and July 31. While, as a practical matter, the close settings meant that Wakefield would likely have to file his anti-SLAPP response prior to the special-appearances hearing, the Defendants did not specifically seek out this result. Based on the record before us, we cannot conclude that the Defendants sought out affirmative relief inconsistent with their assertion that the court lacked personal jurisdiction.[8] *See id.*

---

[7] At the first setting on the Defendants' special appearances, Wakefield filed his response to the special appearances on the morning of the hearing. That same day, he also filed his motion to strike the anti-SLAPP hearing and set his motion for a hearing. According to the Defendants, their request was aimed at preventing these types of last-minute filings.

[8] According to the Defendants, Wakefield declined their request to agree to put off all anti-SLAPP briefing until after the special appearances were resolved. To the extent the Defendants argue that they were forced to choose between waiving their anti-SLAPP motion to dismiss and

Because the Defendants did not enter general appearances prior to the court's determination of their special appearances, we overrule Wakefield's first issue on appeal.

**Law governing specific jurisdiction**

Having concluded that the Defendants did not waive their challenges to personal jurisdiction, we now examine the trial court's conclusion that it lacked personal jurisdiction over the Defendants.

In his second issue on appeal, Wakefield contends that, even if the Defendants did not waive their special appearances, the trial court erred in granting the Defendants' special appearances because the pleadings and the evidence demonstrate that the Defendants committed a tort in whole or in part in this state by "entering into subscription contracts with Texas residents and directly selling and distributing the defamatory articles to residents of this State." In response, the Defendants contend that the pleadings and evidence fail to demonstrate that the Defendants have sufficient minimum contacts with Texas and, in any event, the record supports the trial court's implied conclusion that jurisdiction in Texas would be unreasonable.

Texas courts may assert jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of jurisdiction is

waiving their special appearances, we recognize the apparent conflict in this case created by the anti-SLAPP statute's strict hearing deadline and Rule 120a's special-appearance requirements. *Compare* Tex. Civ. Prac. & Rem. Code § 27.004 ("[I]n no event shall the hearing [on an anti-SLAPP motion to dismiss] occur more than 90 days after service of the motion . . . .") *with* Tex. R. Civ. P. 120a ("Every appearance, prior to judgment, not in compliance with this rule is a general appearance."). We also observe, once again, that the legislature has arguably resolved this conflict in section 27.011 of the anti-SLAPP statute. *See* Tex. Civ. Prac. & Rem. Code § 27.011.

13

consistent with federal and state constitutional guarantees of due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see* Tex. Civ. Prac. & Rem. Code § 17.042 (Texas long-arm statute). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Consequently, "the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations." *Moki Mac River Expeditions*, 221 S.W.3d at 575.

The exercise of jurisdiction over a nonresident comports with due process when (1) the nonresident has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l*, 414 S.W.3d at 150; *see International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). If a defendant's Texas contacts are random, fortuitous, or attenuated, a defendant is not subject to jurisdiction in Texas courts. *Michiana Easy Livin' Country, Inc. v. Holden*, 168 S.W.3d 777, 785 (Tex. 2005). In addition, a defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction of Texas. *Id*. The defendant's activities, whether they consist of direct acts within Texas or conduct outside of Texas, "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A nonresident defendant's contacts can give rise to either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. General jurisdiction exists when the defendant has made continuous and systematic contacts with the forum, such that the forum may exercise jurisdiction over the defendant even if the alleged liability does not arise from or relate to those contacts. *Id*. at 796. In contrast, specific jurisdiction is established if the defendant's alleged liability arises out of or is related to the defendant's contacts with the forum. *Moki Mac River Expeditions*, 221 S.W.3d at 576 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). When, as in this case, only specific jurisdiction is alleged, our minimum-contacts analysis must focus on the relationship among the defendant, the forum, and the litigation. *Id.* at 575-76.

**Minimum-contacts analysis**

The United States Supreme Court has observed that specific jurisdiction for a suit alleging the tort of libel exists in two potential situations: (1) when the publication has an adequate circulation in the forum state, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773-74 (1984), or (2) when the author or publisher "aims" a story at the state knowing that the "effects" of the story will be felt there, *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425 (5th Cir. 2005) (summarizing two tests for specific jurisdiction in libel cases). In this appeal, Wakefield argues that the trial court erred in concluding that the Defendants lacked sufficient contacts with Texas because the Defendants' act of publishing the defamatory articles to its Texas subscribers, standing alone, is sufficient to establish specific jurisdiction. Further, Wakefield argues that the Defendants' additional contacts with Texas are sufficient to establish specific jurisdiction and that the exercise of specific jurisdiction is warranted under *Calder*.

15

**The *Keeton* test**

First, we examine whether the publication of the articles to the *British Medical Journal*'s Texas subscriber base, standing alone, is sufficient to support specific jurisdiction. In *Keeton*, the plaintiff sued a nonresident magazine publisher in New Hampshire for libel based on the contents of the magazine. *Keeton*, 465 U.S at 772. The plaintiff, who was not a resident of New Hampshire, filed suit in the state because the statute of limitations had run in her home state. *Id.* at 773. The Supreme Court concluded that the magazine's regular circulation in New Hampshire (10,000 to 15,000 copies per month) was "substantial," could not "be characterized as random, isolated, or fortuitous," and therefore was sufficient to support personal jurisdiction. *Id.* at 773-74, 781. In doing so, the Supreme Court rejected the argument that the plaintiff's lack of contacts with the forum state defeated jurisdiction and explained that New Hampshire clearly expressed its interest in protecting persons from libel, even nonresidents, and in safeguarding its residents from deception. *Id*. at 777.

In support of his contention that the *British Medical Journal*'s subscriber base in Texas is adequate to establish specific jurisdiction, Wakefield argues we must consider the fact that the *Journal* is "unlike general newspapers targeted to a general population." Wakefield explains that, unlike general newspapers, the *British Medical Journal* is a "specific industry journal targeted to specific medical subscribers." Wakefield argues that when the *Journal*'s subscriber base is considered in this context, we must conclude that it is sufficient to support specific jurisdiction.

In support of his argument, Wakefield cites *Paul Gillrie Institute, Inc. v. Universal Computing Consulting, Ltd.*, 183 S.W.3d 755, 761 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

16

In *Paul Gillrie*, the court of appeals concluded that a trade journal's Texas subscriber base (fifty subscriptions) was sufficient to support jurisdiction under *Keeton*. *Id*. In reaching this conclusion, the court rejected the argument that the trade journal's circulation was necessarily inadequate, explaining:

> [T]he PGI journal is a trade publication with a limited audience targeted to a specific industry, and it is neither surprising nor determinative that the PGI journal has a more limited circulation than that of a nationwide magazine marketed to the general populace. We also note that the record is void of any evidence related to the number of subscribers to the PGI journal, the location of these subscribers, [and] the percentage of subscribers who reside in Texas versus those who reside in other states . . . .

*Id*. at 762.

We do not necessarily agree with the proposition that, when analyzing jurisdiction under *Keeton*, special consideration should be given to the fact that a publication is targeted to a smaller segment of the population. Nevertheless, even if we did, we still would not conclude that the *British Medical Journal*'s subscriber base is adequate in this case.

Here, the record shows that at the time of the publications, the *British Medical Journal* had a print and on-line subscriber base of approximately 48 in Texas, most of which were institutions, such as universities and medical hospitals. In addition, the Journal presented undisputed evidence that this Texas subscriber base makes up less than 1% of its subscriber base worldwide and less than 1% of its corresponding revenue. From this evidence, the trial court could have reasonably concluded that the circulation of the *British Medical Journal* in Texas was not "substantial" and

17

consequently, was inadequate to support personal jurisdiction under *Keeton*.[9] *See Keeton*, 465 U.S. at 781; *Fielding*, 415 F.3d at 425 (concluding that circulation in Texas of 70 issues per week, out of a total 750,000 issues per week, was not "substantial circulation" as required by *Keeton*). Based on the record before us, we conclude that the *British Medical Journal*'s circulation in Texas, standing alone, is not sufficient to establish personal jurisdiction.

**The *Calder* Test**

Next, we consider whether the Defendants' additional contacts with Texas—separate and apart from the *Journal*'s circulation in Texas—are sufficient to establish personal jurisdiction. In *Calder*, a Hollywood actress, Shirley Jones, brought suit in a California court alleging libel in connection with an article published about her in the *National Enquirer*. 465 U.S. at 785. In concluding that the California court had jurisdiction over the reporter and the editor of the story, the Court explained:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her

---

[9] Wakefield also points out that through the licenses for on-line privileges held by institutional subscribers, *the British Medical Journal* articles at issue were, at least potentially, available for viewing by thousands of institutional members. Wakefield argues that this fact must be considered when determining whether the British Medical Journal's Texas circulation is adequate to support jurisdiction under *Keeton*. In effect, Wakefield contends, without any direct authority, that "circulation" under *Keeton* includes not only direct subscribers, but also any potential readers. Because this interpretation would expand the term "circulation" to include almost anyone that potentially has access to an article, whether printed or on-line, we decline to interpret *Keeton* so broadly.

18

> professional reputation, was suffered in California. *In sum, California is the focal point both of the story and of the harm suffered.*

*Id.* at 788-89 (emphasis added).

In *Michiana*, the Texas Supreme Court warned that in applying *Calder*, courts should not focus solely on the defendant's ability to foresee that its actions would cause injury in the forum state . *Michiana Easy Livin' Country*, 168 S.W.3d at 789. The supreme court disapproved of cases in which courts had held that personal jurisdiction exists when the tortfeasor knows that "the brunt of the injury will be felt by a particular resident in the forum state." *Id.* at 788-89. In doing so, the court reasoned that focusing on the brunt of the injury, rather than where the defendant's underlying acts were carried out, ignores the nexus required for specific jurisdiction. *Id.* at 789. "[I]t is 'the defendant's conduct and connection with the forum' that are critical." *Id.* at 789 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

Similarly, the Fifth Circuit has held that the plaintiff's residence in the forum state and the fact that the effects of a story will be felt there, standing alone, are insufficient to establish jurisdiction in defamation cases. *See Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002). The Fifth Circuit has, instead, repeatedly emphasized *Calder*'s requirement that the forum "be the focal point of the story." *Clemens v. McNamee*, 615 F.3d 374, 380 (5th Cir. 2010) (rejecting argument that nonresident defendant knew that plaintiff would suffer harm in Texas and noting that allegedly defamatory statements "did not concern activity in Texas; nor were they made in Texas or directed to Texas residents any more than residents of any state"); *Fielding*, 415 F.3d at 427 (explaining that references to Texas in article were insufficient under *Calder* because Texas was not "focal point"

19

of story); *Revell*, 317 F.3d at 476 (noting that although defendant "must have known that the harm of the article would hit home wherever [plaintiff] resided[,] . . . a more direct aim is required"). Thus, when it is shown that the defendant knows that the plaintiff resides in the forum state and that the effects of an article will be felt there—as is often the case—the issue of personal jurisdiction turns on whether the allegedly defamatory article was purposefully aimed at or directed at the forum. *See Clemens*, 615 F.3d at 380. Underscoring the importance of the defendant's actions in the context of "purposeful availment," the Fifth Circuit has explained that a plaintiff asserting specific jurisdiction in a libel case must show that "(1) the subject matter of and (2) the sources relied upon for the article were in the forum state." *Id.* (citing *Fielding*, 415 F.3d at 426).

Applying *Calder* to this case, we conclude that the record supports the conclusion that the articles were not aimed or directed at Texas. Here, there is no dispute that the articles at issue did not concern activity occurring in Texas. Instead, the publications concerned Wakefield's conduct and activities that occurred in England, and Texas is never mentioned in any of the articles. In addition, Deer testified in his affidavit, submitted in support of his special appearance, that he did not interview any Texas residents or obtain any documents from Texas in connection with the articles. This evidence is sufficient to support the trial court's implied finding that none of the sources relied upon for the articles was located in Texas.[10]

---

[10] Wakefield disputes this fact and contends that Deer contacted Wakefield in Texas during his investigation for the articles. We construe Wakefield's argument as a challenge to the trial court's implied finding on this issue. Based on the record before us, we cannot conclude that the evidence is insufficient to support this finding. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002) (on review of special appearance, trial court's implied findings of fact may be challenged for legal and factual sufficiency). While there is evidence in the record that in 2006 and in 2009 Deer sent e-mails to Wakefield in Texas, Deer testified in his affidavit that these contacts

20

Further, we conclude that the remaining contacts cited by Wakefield also fail to establish that the articles were aimed or directed at Texas residents. *See Revell*, 317 F.3d at 473 (distinguishing *Calder* where article "contains no reference to Texas, nor does it refer to the Texas activities of [plaintiff], and it was not directed at Texas readers as distinguished from readers in other states"). First, Wakefield argues that sufficient minimum contacts exist in this case because "thousands of Texans accessed the *British Medical Journal*'s website and online versions of the defamatory articles." Specifically, Wakefield contends that two of the allegedly defamatory articles were available on the *British Medical Journal*'s website to both subscribers and non-subscribers and that from January 2011 to April 2012 the articles had almost nine thousand views from Texas residents.

We agree that the record supports, and the Defendants do not dispute, the determination that two of the articles at issue were accessed by Texas residents through the *British Medical Journal*'s website. However, simply making an alleged article accessible on a website is insufficient to support specific jurisdiction in a defamation suit. *Revell*, 317 F.3d at 475 (applying *Calder* to defamation suit arising from internet post); *see Reiff v. Roy*, 115 S.W.3d 700, 706 (Tex. App.—Dallas 2003, pet. denied) (explaining sliding scale in analyzing internet use for purposes of personal jurisdiction and noting that "passive websites" are not sufficient to establish minimum contacts

were made in connection with reporting in the *Sunday Times*, not the articles at issue in this case. Also, according to Deer, the e-mails were not sent for the purpose of gathering information, but to "obtain comment from him on new reports that were about to be published in the *Sunday Times*." The evidence on this issue is conflicting, and the trial court, as the finder of fact, was entitled to weigh the evidence and make the determination. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005) (explaining that in conducting legal sufficiency review, court must review evidence in light most favorable to challenged finding and indulge every reasonable inference that would support it).

even though they are accessible to residents of state). Instead, when the content of the article is unrelated to the forum, the plaintiff must establish that the nonresident defendant's internet activity was intended to target and focus on the forum. *Revell*, 317 F.3d at 475. Thus, in this case, the undisputed pleaded facts and evidence must demonstrate that the articles, which did not concern Texas or activities that occurred in Texas, were posted on the *British Medical Journal*'s website with the intention of targeting Texas readers. *Id*. at 474-75 (citing *Young v. New Haven Advocate*, 315 F.3d 256, 258 (4th Cir. 2002) (noting that "application of *Calder* in the internet context requires proof that the out-of-state defendant's Internet activity is expressly directed at or directed to the forum state," and "more than simply making the news article accessible to Virginians . . . was needed for assertion of jurisdiction")). With this is mind, we consider whether the remaining contacts urged by Wakefield demonstrate this intent.

Wakefield argues that the British Medical Journal Publishing Group actively promoted the articles in Texas by "issuing press releases to journalists in Texas and media agencies and associations that serve the State of Texas." According to Wakefield, "the [British Medical Journal Publishing Group] sent the press releases to approximately ten media contacts in Texas, including major Texas newspapers." In support of his argument, Wakefield cites the affidavit of Jane Smith of the Publishing Group.

Smith testified in her affidavit that the "[British Medical Journal Publishing Group] promoted the 'Secrets' series by issuing press releases." Further, the releases were distributed through an e-mail list and through a central service called EurekAlert, "which provides a central place through which universities, medical centers, and journals can distribute science news to the media."

22

However, there is no evidence that EurekAlert was accessed by any Texas journalist and, according to Smith, fewer than 10 out of 2,000 contacts on the e-mail distribution list were located in Texas. Consequently, nothing in the record suggests that any press release was directed to Texas residents any more than residents of any other state. *See Clemens*, 615 F.3d at 380; *Revell*, 317 F.3d at 473.

Finally, Wakefield contends that the trial court failed to consider that the British Medical Journal Publishing Group (1) conducts sales, marketing, and support to citizens in Texas through employees specifically responsible for Texas, (2) profits by selling *the British Medical Journal* in Texas, and (3) contracts and generates advertising revenue from persons and institutions in Texas. While these activities may demonstrate that the Publishing Group sought and obtained benefits and advantages from its business activities in Texas, there is nothing in the record suggesting that Wakefield's lawsuit arises out of or is related to these contacts. *See Moki Mac River Expeditions*, 221 S.W.3d at 576 ("Specific jurisdiction is established if the defendants alleged liability 'arises out of or [is] related to' an activity conducted within the forum.") (citing *Helicopteros Nacionales*, 466 U.S. at 414 n.8). Because there is no assertion or evidence that these activities were specifically carried out in connection with the articles at issue, they lack a "substantial connection" to "the operative facts of the litigation" and therefore are insufficient to support the exercise of specific jurisdiction by Texas courts. *See id.* at 585. Moreover, even if Wakefield were able to demonstrate that some portion of these activities concerned the articles at the center of this dispute, Wakefield does not contend, nor does the evidence suggest, that these activities were directed to Texas residents any more than residents of any other state. *See Clemens*, 615 F.3d at 380.

23

The record contains no evidence that the allegedly defamatory articles, whether published in print or made available on-line, were directed or aimed at Texas—a forum which has no relationship to the subject matter of the articles or to any underlying sources. Even if it were foreseeable that the articles would have some effect in Texas, we conclude that the record before us fails to establish a substantial connection between the Defendants' alleged defamatory conduct and the State of Texas sufficient to warrant the exercise of specific jurisdiction over the Defendants. Because the trial court could have concluded that it lacked personal jurisdiction on this basis alone, we overrule Wakefield's second issue on appeal without considering whether the trial court erred in concluding that the exercise of jurisdiction would "offend traditional notions of fair play and substantial justice." Further, because our holding that the trial court lacks specific jurisdiction is dispositive of this appeal, we do not decide Wakefield's third issue.

## CONCLUSION

Having overruled appellant's first and second issues on appeal, we affirm the trial court's judgment.

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Goodwin and Field

Affirmed

Filed: September 19, 2014

24