# IN THE SUPREME COURT OF TEXAS

No. 14-0186

TV AZTECA, S.A.B. DE C.V., PATRICIA CHAPOY, AND PUBLIMAX, S.A. DE C.V.,
PETITIONERS,

v.

GLORIA DE LOS ANGELES TREVINO RUIZ, INDIVIDUALLY AND ON BEHALF OF A
MINOR CHILD, A.G.J.T, AND ARMANDO ISMAEL GOMEZ MARTINEZ, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued October 12, 2015**

JUSTICE BOYD delivered the opinion of the Court.

This is an interlocutory appeal from the denial of Petitioners' special appearances. Petitioners are Mexican citizens who broadcast television programs on over-the-air signals that originate in Mexico but travel into parts of Texas. Respondents are Texas residents who allege Petitioners defamed them in some of those programs. We hold that the allegations and evidence that Petitioners harmed Texas residents in Texas, Petitioners' broadcasts were viewable in Texas, and Petitioners knew Texans could watch the programs in Texas are insufficient to establish that Petitioners purposefully availed themselves of the benefits of conducting activities in Texas. However, that evidence, taken together with evidence that Petitioners exploited the Texas market to capitalize on the broadcasts that traveled into Texas, does establish purposeful availment and provides a constitutional basis for exercising jurisdiction over Petitioners in this case. Because Respondents' claims arise from and relate to those broadcasts, and the exercise of jurisdiction

comports with traditional notions of fair play and substantial justice, we affirm the court of appeals' judgment.

# I.
# Background

Mexican recording artist Gloria de Los Angeles Trevino Ruiz, popularly known as Gloria Trevi (and sometimes referred to as "Mexico's Madonna"), now lives in Texas. Near the height of Trevino's fame in the late 1990s, she was accused of luring underage girls into sexual relationships with her manager. Authorities arrested Trevino and her manager in Brazil on charges of sexual assault and kidnapping. Trevino spent nearly five years in prisons in Brazil and Mexico, but a Mexican judge ultimately found her not guilty and dismissed all charges in 2004.

After her acquittal, Trevino moved to McAllen, Texas, and later married Armando Gomez, a Mexican attorney who had defended her in the criminal proceedings. In the late 2000s, as the ten-year anniversary of the scandal approached, various Mexican media outlets ran stories discussing the events and Trevino's activities following her acquittal. In 2009, Trevino, acting individually and on behalf of her minor son, and Gomez (collectively, Trevino)[1] filed this lawsuit in Hidalgo County, alleging that several media defendants defamed them in their broadcasts.[2] Trevino asserts that she and others viewed the defamatory programs on their televisions in Texas.

---

[1] Although Gomez is a named plaintiff and the petition includes broad allegations that all defendants collectively defamed all plaintiffs, the pleadings and evidence focus almost exclusively on alleged defamatory statements about Trevino. We refer to the plaintiffs collectively as Trevino unless we must distinguish between them. We address only personal jurisdiction and do not consider or address the merits of the plaintiffs' claims.

[2] Trevino asserted claims for defamation, business disparagement, civil conspiracy, and tortious interference with existing and prospective business relationships and contracts. All of the claims are based on Petitioners' allegedly defamatory broadcasts. The pleadings allege conduct both before and after Trevino's acquittal in 2004, but Trevino focuses, in this appeal, on defamation that occurred after her acquittal. We do not address the extent to which the statute of limitations may bar any of the claims.

The relevant defendants are two Mexican television broadcasting companies, TV Azteca, S.A.B. de C.V., and Publimax, S.A.B. de C.V., and a Mexican citizen, Patricia Chapoy, a news anchor and producer for TV Azteca. Trevino alleges that TV Azteca, Publimax, and Chapoy (collectively, Petitioners) defamed her on several occasions, primarily in stories on a television program called *Ventaneando*, a Spanish-language entertainment news program that TV Azteca produced, Chapoy hosted, and Publimax aired on television stations affiliated with TV Azteca. Petitioners filed special appearances challenging the trial court's jurisdiction over them. The trial court denied the special appearances, and this interlocutory appeal followed.[3] The court of appeals affirmed the trial court's denial of the special appearances, — S.W.3d —, 2014 WL 346031, and we granted review to consider, as a matter of first impression in this Court, whether a television broadcast that originates outside Texas but travels into the state can support personal jurisdiction over the broadcaster in Texas.

## II.
## Jurisdictional Requirements

We begin by summarizing the well-established limits on a trial court's jurisdiction. A court has power to decide a case only if it has "both subject matter jurisdiction over the controversy and personal jurisdiction over the parties." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010).

---

[3] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (permitting appeal from interlocutory orders that grant or deny a special appearance under Rule 120a); TEX. R. CIV. P. 120a(1) (permitting special appearance "for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State"). We conclude that inconsistencies between the court of appeals' decision and our prior decisions addressing personal jurisdiction establish a conflict that authorizes our jurisdiction over this interlocutory appeal. *See* TEX. GOV'T CODE §§ 22.001(a)(2), 22.225(b)(3), (c), (e).

3

Subject matter jurisdiction involves a court's "power to hear a particular type of suit," while personal jurisdiction "concerns the court's power to bind a particular person or party." *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). Petitioners argue that Texas courts lack personal jurisdiction over them.

Courts have personal jurisdiction over a nonresident defendant when the state's long-arm statute permits such jurisdiction and the exercise of jurisdiction is consistent with federal and state due-process guarantees. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The Texas long-arm statute broadly allows courts to exercise personal jurisdiction over a nonresident who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE § 17.042(2). Because this statute reaches "as far as the federal constitutional requirements for due process will allow," Texas courts may exercise jurisdiction over a nonresident so long as doing so "comports with federal due process limitations." *Spir Star*, 310 S.W.3d at 872 (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).

Consistent with federal due process protections, a state court can exercise jurisdiction over a nonresident defendant only if (1) the defendant has established "minimum contacts" with the state and (2) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see Moncrief Oil*, 414 S.W.3d at 150. We will address both requirements in turn, in light of the allegations and evidence in this case.[4]

---

[4] Whether a court has jurisdiction is a question of law that we review de novo. *Moncrief Oil*, 414 S.W.3d at 150. The plaintiff bears "the initial burden of pleading allegations sufficient to confer jurisdiction," and the burden then shifts to the defendant "to negate all potential bases for personal jurisdiction the plaintiff pled." *Id.* at 149. A defendant can negate jurisdiction either legally or factually. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659

### III.
### Minimum Contacts

The minimum-contacts requirement protects due-process rights by permitting a state to exercise jurisdiction over a nonresident defendant only when the defendant "could reasonably anticipate being haled into court there." *Moncrief Oil*, 414 S.W.3d at 152. Minimum contacts may create either general or specific personal jurisdiction. *Id.* at 150. A court has general jurisdiction over a nonresident defendant whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). This test requires "substantial activities within the forum" and presents "a more demanding minimum contacts analysis than for specific jurisdiction." *BMC Software*, 83 S.W.3d at 797. When a court has general jurisdiction over a nonresident, it may exercise jurisdiction "even if the cause of action did not arise from activities performed in the forum state." *Spir Star*, 310 S.W.3d at 872.

By contrast, courts may exercise specific jurisdiction when the defendant's forum contacts are "isolated or sporadic," as opposed to "continuous and systematic," but only if the plaintiff's cause of action arises from or relates to those contacts. *Id.* at 872–73 (quoting 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3d ed. 2002)); *see*

---

(Tex. 2010). Legally, the defendant can show that the plaintiff's alleged jurisdictional facts, even if true, do not meet the personal jurisdiction requirements. *See id.* Factually, the defendant can present evidence that negates one or more of the requirements, controverting the plaintiff's contrary allegations. *Id.* The plaintiff can then respond with evidence supporting the allegations. *Id.* If the parties present conflicting evidence that raises a fact issue, we will resolve the dispute by upholding the trial court's determination. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009); *see also BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Moncrief Oil*, 414 S.W.3d at 150.

*also Moncrief Oil*, 414 S.W.3d at 150 ("[S]pecific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state."). For specific jurisdiction, we must analyze the defendant's contacts "on a claim-by-claim basis" to determine whether each claim arises out of or is related to the defendant's minimum contacts. *Moncrief Oil*, 414 S.W.3d at 150.

Trevino alleged that the trial court has both general and specific personal jurisdiction over Petitioners. The trial court denied Petitioners' special appearances without specifying which type of jurisdiction it found. Affirming the trial court's decision, the court of appeals found that the trial court has specific jurisdiction, and it did not reach the general-jurisdiction issue. — S.W.3d at —, 2014 WL 346031, at *26. We therefore also address specific jurisdiction. Because we conclude the evidence establishes that Petitioners purposefully availed themselves of the benefits of conducting activities in Texas and that Trevino's claims arise from or relate to those purposeful contacts, we do not reach the general-jurisdiction issue.

## A.      Purposeful Availment

To establish minimum contacts for both general and specific jurisdiction, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Moncrief Oil*, 414 S.W.3d at 150 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Due process requires purposeful availment because personal jurisdiction "is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). Three principles guide our analysis of whether a nonresident has purposefully availed itself of the privilege of conducting activities in Texas:

6

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage[,] or profit by availing itself of the jurisdiction.

*Moncrief Oil*, 414 S.W.3d at 151 (quoting *Retamco*, 278 S.W.3d at 338–39).

To constitute purposeful availment, the defendant's contacts must be "purposefully directed" to the state, *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991), and must result from the defendant's own "efforts to avail itself of the forum." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007). "[A] defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous,'" *Michiana*, 168 S.W.3d at 785 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)), or on the "unilateral activity of another party or a third person." *Guardian Royal*, 815 S.W.2d at 226 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Through its purposeful forum contacts, the defendant must have sought "some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785. In conducting this analysis, we assess "the quality and nature of the contacts, not the quantity." *Moncrief Oil*, 414 S.W.3d at 151.

TV Azteca is a Mexican national broadcasting company that provides programs to affiliated network-television stations. Publimax operates two such stations in Monterrey, Mexico, which are licensed by the Mexican government. Publimax pays TV Azteca for the exclusive right to broadcast TV Azteca programs in northeastern Mexico. Chapoy produces and hosts one of those programs, *Ventaneando*. Both TV Azteca and Publimax are Mexican corporations, are not registered in Texas or any of the United States, and do not have any offices, employees, agents, or

representatives in Texas. Chapoy is a Mexican citizen and resident, has never been a Texas citizen or resident, does not have an office or agent for service of process in Texas, and has never been a party to a lawsuit in Texas other than this suit. Nevertheless, Trevino contends that Texas courts have specific personal jurisdiction over all three Petitioners because they purposefully availed themselves of the benefits of conducting activities in Texas when they defamed her in broadcasts that aired in Texas. As this is our first opportunity to address specific jurisdiction in the context of defamation claims arising from media broadcasts, we begin by reviewing four key precedents that are crucial to our analysis. We then apply those precedents to the allegations and evidence to determine whether Petitioners purposefully availed themselves of the benefits of doing business in Texas.

**1.      Guiding precedents**

Numerous other courts, including the United States Supreme Court, have addressed specific personal jurisdiction in cases involving claims based on alleged defamatory or false

statements[5] and in cases involving claims arising out of media broadcasts.[6] Although all are helpful

to our analysis, four decisions—three from the United States Supreme Court and one from this

Court—are worth describing in detail as a foundation for the discussion that follows.

a.      *Keeton*

In *Keeton*, a New York resident filed a defamation suit in New Hampshire against the

publisher of *Hustler* magazine, an Ohio corporation with headquarters in California. 465 U.S. at

---

[5] *See, e.g.*, *Walden v. Fiore*, 134 S. Ct. 1115, 1119–20 (2014) (holding Nevada courts lacked specific jurisdiction over Georgia resident who allegedly used false affidavit to violate Nevada residents' Fourth Amendment rights); *Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (holding California courts had specific jurisdiction over Florida residents who allegedly defamed California resident in newspaper article); *Keeton*, 465 U.S. at 770 (holding New Hampshire courts had specific jurisdiction over Ohio corporation that allegedly defamed New York resident in magazine articles); *Clemens v. McNamee*, 615 F.3d 374, 380 (5th Cir. 2010) (holding Texas courts lacked specific jurisdiction over New York resident who allegedly defamed Texas resident in statements to federal investigators); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 422 (5th Cir. 2005) (holding Texas courts lacked specific jurisdiction over German and New York companies that allegedly defamed German residents in magazine article); *Revell v. Lidov*, 317 F.3d 467, 476 (5th Cir. 2002) (holding Texas courts lacked specific jurisdiction over Massachusetts resident and New York university that allegedly defamed Texas resident in article posted on university's internet bulletin board); *Young v. New Haven Advocate*, 315 F.3d 256, 158–59 (4th Cir. 2002) (holding Virginia courts lacked specific jurisdiction over Connecticut newspapers that allegedly defamed Virginia resident in articles posted on internet); *Johns Hopkins Univ. v. Nath*, 238 S.W.3d 492, 495–96 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding Texas courts lacked specific jurisdiction over Maryland physician who allegedly defamed Texas physician through verbal statements and emails).

[6] *See, e.g.*, *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 411 (7th Cir. 1994) (holding Indiana courts had specific jurisdiction to enjoin Canadian Football League's Baltimore Colts team, which allegedly infringed Indiana plaintiff's trademark by broadcasting games in Indiana); *Holmes v. TV-3, Inc.*, 141 F.R.D. 692, 696–97 (W.D. La. 1991) (holding Louisiana courts had specific jurisdiction over Mississippi television station and reporter who allegedly defamed Louisiana residents in program broadcast in Mississippi but viewable in Louisiana); *Tonka Corp. v. TMS Entm't.*, 638 F. Supp. 386, 387, 391 (D. Minn. 1985) (holding Minnesota courts had specific jurisdiction over California corporation that allegedly infringed Minnesota company's trademark through television show that aired in Minnesota); *Thomas Jackson Publ'g., Inc. v. Buckner*, 625 F. Supp. 1044, 1045–46 (D. Neb. 1985) (holding Nebraska courts had specific jurisdiction over Georgia residents who allegedly infringed Nebraska plaintiff's copyright to song that defendants discussed and performed in television and radio broadcasts in Nebraska); *Massey Energy Co. v. United Mine Workers*, 69 Va. Cir. 118, 118–19 (Va. Cir. Ct. 2005) (holding Virginia court had specific jurisdiction over West Virginia organization and its chairman who allegedly defamed Virginia residents in television ad broadcast in West Virginia but viewable in Virginia); *Pegler v. Sullivan*, 432 P.2d 593, 597 (Ariz. Ct. App. 1967) (holding Arizona courts had specific jurisdiction over New York producer and publisher who allegedly invaded Arizona plaintiffs' privacy through skit performed on national show that aired in Arizona); *United Med. Labs., Inc. v. Columbia Broad. Sys., Inc.*, 256 F. Supp. 570, 572 (D. Or. 1966) (holding Oregon courts had specific jurisdiction over nonresidents who allegedly defamed Oregon plaintiff through national news show that aired in Oregon).

772. The plaintiff apparently filed in New Hampshire because it was the only state where limitations had not run. *Id.* at 773. Although the defendant's only contacts with New Hampshire consisted of monthly magazine sales there, the Court concluded that the distribution of "some 10,000 to 15,000 copies of *Hustler* magazine in that State each month" could not "by any stretch of the imagination be characterized as random, isolated, or fortuitous." *Id.* at 772, 774. The Court viewed this as evidence that the defendant "chose to enter the New Hampshire market," *id.* at 779, and found it to be "sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Id.* at 773–74.

Although the plaintiff in *Keeton* had almost no connection with New Hampshire, the Court noted that "the jurisdictional inquiry . . . focuses on the relations among *the defendant*, the forum, and the litigation." *Id.* at 780 (emphasis added). Referencing its decision in *Calder v. Jones*, 465 U.S. 783 (1984), which the Court released on the same day as *Keeton*, the Court explained that the plaintiff's residence "is not . . . completely irrelevant" because the "plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum." *Id.* (citing *Calder*, 465 U.S. at 788–89). "Plaintiff's residence," in other words, "may be the focus of the activities of the defendant out of which the suit arises." *Id.* "But plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." *Id.* Noting that "New Hampshire has a significant interest in redressing injuries that actually occur within the State" and that "[t]he tort of libel is generally held to occur wherever the offending material is circulated," *id.* at 776–77, the Court concluded that, because the defendant had "continuously and deliberately exploited the New

10

Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781.

        b.     *Calder*

In *Calder*, Hollywood actress Shirley Jones filed suit in California asserting defamation claims based on statements in a *National Enquirer* article. 465 U.S. at 785. Jones sued the *Enquirer*'s owner, its local distributing company, the reporter who wrote the article, and the editor who revised and approved the final draft. *Id.* at 785–86. The reporter and editor, who resided in Florida and prepared the article there, challenged the California court's personal jurisdiction over them. Although the Court acknowledged that the reporter and editor did not create the article in California or personally direct or control its circulation to the state, it found that several facts established that California was "the focal point both of the story and of the harm suffered." *Id.* at 789. Specifically, the Court noted that the article (1) targeted California because it "concerned the California activities of a California resident" and "was drawn from California sources," and (2) caused Jones to suffer "the brunt of the harm" in California. *Id.* at 788–89. Because the *Enquirer* sold nearly twice as many copies in California than in any other state, the reporter and editor "knew that the brunt of that injury would be felt by [Jones] in the State in which she lives and works and in which the *National Enquirer* has its largest circulation." *Id.* at 789–90. Considering "the 'effects' of their Florida conduct in California" and the evidence that "their intentional, and allegedly tortious, actions were expressly aimed at California," the Court concluded that the reporter and editor "must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." *Id.* (quoting *World-Wide Volkswagen Corp. v.*

11

*Woodson*, 444 U.S. 286, 297 (1980)). The Court referred to this analytical approach as the "'effects' test." *Id*. at 787 n.6.

Although the facts that Jones was a California resident and suffered "the brunt of the harm" there were critical to the Court's decision, the Court acknowledged, as it did in *Keeton*, "In judging minimum contacts, a court properly focuses on 'the relationship among *the defendant*, the forum, and the litigation.'" *Id.* at 788 (emphasis added) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Cross-referencing its decision in *Keeton*, the Court explained that the plaintiff's "lack of 'contacts' will not defeat otherwise proper jurisdiction," but those contacts "may be so manifold as to permit jurisdiction when it would not exist in their absence." *Id.* (citing *Keeton*, 465 U.S. at 778–81). The plaintiff's lack of contacts with New Hampshire was not decisive in *Keeton*, but the plaintiff's contacts with California were crucial to the Court's decision in *Calder* because they evinced "the 'effects' of [the defendant's] Florida conduct in California." *Id.* at 789.

      c.    *Michiana*

We previously addressed and applied *Keeton* and *Calder* in *Michiana*, 168 S.W.3d at 781–85. Although the claims in *Michiana* were not based on defamatory statements or broadcasts, our discussion of *Keeton* and *Calder* in *Michiana* helps lay the proper foundation for the resolution of this case. The plaintiff in *Michiana*, a Texas resident, purchased a recreational vehicle from an Indiana dealer that "only did business in Indiana." *Id.* at 781. Seeking a lower price than he could get from a Texas dealer, the plaintiff called the dealer in Indiana to negotiate the deal, then "sent payment to Indiana, paid for delivery from Indiana, and agreed to resolve every dispute in Indiana." *Id.* But when a dispute arose, he filed in Texas, asserting claims for breach of contract, breach of warranty, fraud, and DTPA violations based on misrepresentations the dealer allegedly made

during the parties' phone call. *Id.* at 784; *see also id.* at 794 (Medina, J., dissenting) (listing causes of action asserted). Relying on the three principles that govern a purposeful-availment analysis— only the defendant's forum contacts count; the contacts must be "purposeful" rather than "random, isolated, or fortuitous"; and the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction"—we held that the evidence did not establish that the dealer had purposefully availed itself of the privilege of conducting activities in Texas. *Id.* at 785.

We then addressed the court of appeals' holding that Texas could assert specific jurisdiction over the dealer because the dealer had "committed a tort in Texas" by making misrepresentations in its phone call with the plaintiff. *Id.* at 788. Like several other Texas appellate courts, the court of appeals had relied on *Calder* to hold that "[i]f a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions." *Id.* We rejected that overly simplistic interpretation of *Calder* because it ignored *Calder*'s reliance on the fact that the defendants knew that their article "was for their employer, the *National Enquirer*, which sold more than 600,000 copies in the forum state every week." *Id.* at 789 (citing *Calder*, 465 U.S. at 785 n.2). The *Calder* defendants' article "constituted a substantial 'presence' in the state." *Id.* The single RV the *Michiana* defendant sold to a Texas resident did not. Construing *Calder* in light of *Keeton*'s reliance on the defendant's distributing thousands of copies of its publication in the forum state, we rejected a jurisdictional test "based solely upon the effects or consequences" in the forum state, such as the court of appeals' "directed-a-tort" test, and concluded that "the important factor was the extent of the defendant's activities, not merely the residence of the victim." *Id.* at 789–90.

13

d.     *Walden*

The Supreme Court recently confirmed our understanding of *Calder* and *Keeton* in *Walden v. Fiore*, 134 S. Ct. 1115 (2014). The defendant in *Walden*, a Georgia police officer assigned to a federal drug-interdiction team, confiscated money from the plaintiffs at the Atlanta airport. *Id.* at 1119. The plaintiffs were Nevada residents catching a connecting flight in Atlanta on their way from Puerto Rico. *Id.* They sued the Georgia defendant in Nevada, alleging he violated their Fourth Amendment rights by seizing and attempting to forfeit their money, in part by signing a false affidavit. *Id.* at 1119–20. The Ninth Circuit concluded that Nevada courts had specific jurisdiction over the Georgia defendant because the defendant had "'expressly aimed' his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a 'significant connection' to Nevada." *Id.* at 1120. The Supreme Court reversed, holding that "the mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126.

The Court reaffirmed that the specific-jurisdiction inquiry "focuses 'on the relationship among the defendant, the forum, and the litigation.'" *Id.* at 1121 (quoting *Keeton*, 465 U.S. at 775). Thus, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," *id.* at 1122 (quoting *Burger King*, 471 U.S. at 475), and the "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," *id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). The Court explained that *Calder* focused on the "various contacts the defendants had created with California (and not just with the plaintiff)." *Id.* at 1123. The defendants' contacts were sufficient in *Calder* because they had relied on "California sources" for information, they had written "the story about

14

the plaintiff's activities in California," and they had caused the "brunt of the injury" in California "by writing an allegedly libelous article that was widely circulated in the State." *Id.* (quoting *Calder*, 465 U.S. at 788–89). "In sum, California [wa]s the focal point both of the story and of the harm suffered." *Id.* (quoting *Calder*, 465 U.S. at 789). Under *Calder*, "mere injury to a forum resident is not a sufficient connection to the forum." Instead, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State," and "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 1125.

## 2. Petitioners' Contacts

With these precedents and principles in mind, we now consider Trevino's allegations and the evidence regarding Petitioners' contacts with Texas to determine whether they support the trial court's finding that Petitioners purposefully availed themselves of the benefits of conducting activities in the state. Specifically, we consider allegations and evidence that Petitioners:

- "directed a tort" at Trevino in Texas;
- broadcast allegedly defamatory statements in Texas;
- knew the statements would be broadcast in Texas; and
- intentionally targeted Texas through those broadcasts.

We conclude that the evidence of the first three contentions does not establish purposeful availment, but the evidence of the fourth one does.

### a. *The "directed-a-tort" test*

No one disputes that Trevino resides in Texas and the brunt of any injuries she suffered from Petitioners' broadcasts occurred in Texas. Petitioners argue, however, that the court of appeals erred by finding jurisdiction based on these facts because we expressly rejected the

15

"directed-a-tort" test for specific jurisdiction in *Michiana*. Petitioners are mostly correct. *See Michiana*, 168 S.W.3d at 788–91. We explained in *Michiana* that courts cannot base specific jurisdiction merely on the fact that the defendant "knows that the brunt of the injury will be felt by a particular resident in the forum state." *Id.* at 788. "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Walden*, 134 S. Ct. at 1122 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

As Trevino notes, however, the court of appeals did not rely on the mere fact that Trevino lives in Texas and allegedly suffered harm here. To the contrary, the court agreed with Petitioners that its analysis should not focus "on where the plaintiffs felt the harm caused by the defamation if the defendants have not directed the publication or broadcast at the forum," and explained that it had "not considered [Trevino's] injury or residence in [its] analysis because it is not relevant." — S.W.3d at —, 2014 WL 346031, at *22. Petitioners contend that, despite these disclaimers, the court in fact relied on the directed-a-tort test by holding that Texas courts can exercise specific jurisdiction because Petitioners "purposefully directed their broadcasts at Texas." *Id.* at *25. We disagree.

There is a subtle yet crucial difference between directing a tort at an individual who happens to live in a particular state and directing a tort at that state. In *Michiana*, for example, the defendant allegedly directed a tort (by making misrepresentations in a phone call) at a plaintiff who lived in Texas, but that was the defendant's only contact *with Texas*. 168 S.W.3d at 789. By contrast, in *Keeton*, the plaintiff did not even reside in the forum state, but the defendant had "continuously and deliberately exploited the New Hampshire market" by regularly distributing its

magazines there. 465 U.S. at 781. Thus, when the magazine ran a story that allegedly defamed the plaintiff, it directed a tort at the state of New Hampshire, not just at the plaintiff. Under *Keeton*, *Calder*, *Walden*, and *Michiana*, the fact that the plaintiff lives and was injured in the forum state is not irrelevant to the jurisdictional inquiry, but it is relevant only to the extent that it shows that *the forum state* was "the focus of the activities of the defendant." *Keeton*, 465 U.S. at 780. We thus conclude, as the court of appeals also concluded, that the mere fact that Petitioners directed defamatory statements at a plaintiff who lives in and allegedly suffered injuries in Texas, without more, does not establish specific jurisdiction over Petitioners.

> b.     *Broadcasts into Texas*

We next address Trevino's allegations and evidence that Petitioners' broadcasts, though originating in Mexico, reached Texas residents through their television sets in their Texas homes. Petitioners do not dispute this contention, at least with respect to over-the-air transmissions. Publimax's controller explained that TV Azteca's two affiliated stations in Monterrey direct their broadcasts "at viewers in the northeast zone of Mexico, not Texas," but he acknowledged that households in South Texas may receive the broadcasts due to "signal 'spill-over,'" which results from the over-the-air signals "following the law of physics." Petitioners concede that the signals carry "far enough that they might be received by households or cable system operators in a small section of the Rio Grande Valley," and that Texas cable companies that receive those signals may rebroadcast them to their cable subscribers. As the court of appeals noted, there is evidence that "programs broadcast by TV Azteca and Publimax [are] seen in Texas potentially by over one million viewers." — S.W.3d at —, 2014 WL 346031, at *20. Comparing these broadcasts to the *Keeton* and *Calder* defendants' "regular circulation" of thousands of magazines in those forum

17

states, the court concluded that Petitioners' act of "broadcasting programs to residents of Texas supports an assertion of jurisdiction in this case." *Id.*

Petitioners and their supporting amici[7] vigorously contend that the court erred by equating television broadcasts to the distribution of magazines and newspapers. The Texas Association of Broadcasters, for example, explains that *Keeton* and *Calder* were based on the distribution of written publications that involved voluntary contractual agreements, not "the simple fact that broadcast transmissions do not respect international borders." If the "over-the-air transmission of television signals" constitutes "business in Texas," they contend, then every television and radio broadcaster "deep in Mexico" whose signal reaches over the border is "doing business in Texas," as is "virtually every out-of-state Internet service provider which operates a website accessible in Texas."[8] Petitioners contend that, for purposes of establishing specific jurisdiction, "TV signals that stray into a forum do not constitute a contact with the forum."

Several courts have addressed specific jurisdiction based on electronic broadcasts, and many have at least arguably found minimum contacts based solely on the fact that the broadcasts

---

[7] The National Association of Broadcasters and the Texas Association of Broadcasters each submitted amicus briefs supporting Petitioners.

[8] For twenty years already, courts around the country have struggled to determine how to apply personal-jurisdiction principles to a defendant's Internet website or activities, which are often accessible in every jurisdiction. *See, e.g.*, TiTi Nguyen, *A Survey of Personal Jurisdiction Based on Internet Activity: A Return to Tradition*, 19 BERKELEY TECH. L.J. 519 (2004); Michael Geist, *Is There a There There? Toward Greater Certainty for Internet Jurisdiction*, 16 BERKELEY TECH. L.J. 1345 (2001). The Texas Association of Broadcasters urges us to announce a test for both broadcasters and Internet publishers because both disseminate content by "putting it out there" for whomever chooses to access it, and because of "the expansion of streaming video and retransmission," the distinction between broadcasters and Internet publishers is likely to collapse even further in the near future." While we acknowledge that the two types of media may share similarities, this case does not present an Internet-based jurisdictional issue, so any discussion of that issue would be advisory.

could be received in the forum state.[9] Citing several of these decisions, the court of appeals "conclude[d] that broadcasting programs to residents of Texas supports an assertion of jurisdiction in this case." — S.W.3d at —, 2014 WL 346031, at *20. To the extent any of these courts found specific jurisdiction based *solely* on broadcasts in the forum state, however, we disagree. The "touchstone of jurisdictional due process" is "purposeful availment," *Michiana*, 168 S.W.3d at 784, and a defendant purposefully avails itself of the benefits of activities in the state only when its contacts are "purposeful rather than random, fortuitous, or attenuated," and it seeks "some benefit, advantage[,] or profit by availing itself of the jurisdiction." *Moncrief Oil*, 414 S.W.3d at 151 (quoting *Retamco*, 278 S.W.3d at 338–39). We agree with Petitioners that the mere fact that the signals through which they broadcast their programs in Mexico travel into Texas is insufficient to support specific jurisdiction because that fact does not establish that Petitioners purposefully directed their activities at Texas.

### c. *Knowledge of the forum broadcasts*

Trevino argues, however, that Petitioners *knew* their broadcasts would reach Texas homes.

---

[9] *See, e.g.*, *Indianapolis Colts*, 34 F.3d at 411–12 (7th Cir. 1994) (finding specific jurisdiction based on broadcasts of football games on nationwide cable television); *Digital Equip. Corp. v. AltaVista Tech.*, 960 F. Supp. 456, 466 n.20 (D. Mass. 1997) ("Numerous courts have held that jurisdiction can be based on the broadcasting of a television program (or advertising) into the forum state . . . ."); *Holmes v. TV-3, Inc.*, 141 F.R.D. 692 (W.D. La. 1991) (finding specific jurisdiction over television station and reporter based on program broadcast in Mississippi but viewable in Louisiana); *Tonka Corp. v. TMS Entm't., Inc.*, 638 F. Supp. 386, 391 (D. Minn. 1985) (finding specific jurisdiction based on television show that aired in forum state); *Thomas Jackson Publ'g, Inc. v. Buckner*, 625 F. Supp. 1044, 1046 (D.Neb.1985) (finding specific jurisdiction based on national television program, radio broadcast, and cable television network show that aired in the forum state); *United Med. Labs., Inc. v. CBS, Inc.*, 256 F. Supp. 570, 572 (D. Or. 1966) (finding personal jurisdiction over Walter Cronkite and news producer based on television program broadcast in forum state); *Massey Energy*, 69 Va. Cir. 118, 121 (stating television advertisement that "reached homes" in forum state was "alone a sufficient basis of jurisdiction under the statute"); *Pegler v. Sullivan*, 432 P.2d 593 (Ariz. Ct. App. 1967) (finding specific jurisdiction based on television show that aired in forum state).

Trevino points to evidence, for example, that Publimax stated on its website that the two Monterrey television stations reached 766,087 viewers in South Texas in 2008 and 1,583,829 in 2012. Petitioners do not dispute that they knew the programs could be viewed in Texas, but they contend that mere known accessibility is not enough to support specific jurisdiction. Instead, they assert, the defendant must "aim" its broadcasts at the forum state. *See, e.g.*, *Calder*, 465 U.S. at 789 (noting that defendants were "not charged with mere untargeted negligence," but "expressly aimed" their actions at California).

Many of the courts that found jurisdiction based on broadcasts in the forum expressly noted that the defendants knew that the broadcasts would be viewable in those states.[10] Petitioners contend the court of appeals did the same in this case by concluding, for example, that Chapoy's knowledge that her program would be viewed on TV Azteca by Texas residents "supports a finding that Chapoy directed the statements she made on *Ventaneando* to residents of Texas." — S.W.3d at —, 2014 WL 346031, at *24. Again, to the extent courts have found jurisdiction based solely on the defendants' knowledge that their broadcasts could be viewed in the forum, we disagree. Because the minimum-contacts test is intended to ensure that the defendant could "reasonably anticipate" being sued in the forum's courts, *World-Wide Volkswagen*, 444 U.S. at 297,

---

[10] *See, e.g.*, *Holmes*, 141 F.R.D. at 696 (noting that map broadcasters used to solicit advertisers showed a "large portion" of its broadcast area was in the forum state, and holding that "[t]his deliberate reliance upon the signal reaching Louisiana is a significant contact with the State"); *Tonka Corp.*, 638 F. Supp. at 391 (finding specific jurisdiction because defendant "obviously knew that ABC would be syndicating the program nationwide, including" in the forum state); *Massey Energy*, 69 Va. Cir. at 126 (finding specific jurisdiction because television station "regularly broadcast into" the forum state and "must have foreseen" that they would be sued there); *Pegler*, 432 P.2d at 596–97 (holding Ed Sullivan "entered Arizona" by producing skit with knowledge that it would be aired in Arizona, thus making his actions "voluntary, purposeful, reasonably foreseeable and calculated to have effect in Arizona," thus creating minimum contacts with the state); *United Medical Labs.*, 256 F. Supp. at 572 (holding Walter Cronkite's forum activities were "voluntary" and "purposeful" because he "knew that the particular material would be broadcast in the [forum] state").

"foreseeability is an important consideration" in the analysis, *BMC Software*, 83 S.W.3d at 795.

But "foreseeability alone will not support personal jurisdiction." *CSR Ltd.*, 925 S.W.2d at 595.

Instead, the defendant must reasonably anticipate being sued in the forum *because of* actions the

defendant "purposefully directed toward the forum state." *Id.* (quoting *Asahi Metal Indus. Co. v.*

*Superior Court of Cal.*, 480 U.S. 102, 112 (1987) (plurality opinion)). While a defendant's

knowledge that its actions will create forum contacts may support a finding that the defendant

purposefully directed those actions at the forum, that knowledge alone is not enough.

We find a helpful analogy on this issue in our stream-of-commerce cases. Under the

stream-of-commerce theory of personal jurisdiction, "a nonresident who places products into the

'stream of commerce' with the expectation that they will be sold in the forum state" may be subject

to personal jurisdiction in the forum. *Moki Mac*, 221 S.W.3d at 576–77. But even under that theory,

mere knowledge that the product will be sold in the forum state is not enough. A product seller's

"awareness that the stream of commerce may or will sweep the product into the forum State does

not convert the mere act of placing the product into the stream into an act purposefully directed

toward the forum State." *CSR*, 925 S.W.2d at 595 (quoting *Asahi*, 480 U.S. at 112). Instead,

"additional conduct" must demonstrate "an intent or purpose to serve the market in the forum

State." *Moki Mac*, 221 S.W.3d at 577 (quoting *Asahi*, 480 U.S. at 112); *see also J. McIntyre*

*Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2788 (2011) ("The defendant's transmission of goods

permits the exercise of jurisdiction only where the defendant can be said to have targeted the

forum; as a general rule, it is not enough that the defendant might have predicted that its goods

will reach the forum State."); *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397

(Tex. 2010) ("The fact that a seller knows his goods will end up in the forum state does not support

jurisdiction when the seller made no attempt to market its goods there."); *Moki Mac*, 221 S.W.3d at 577 ("[T]he facts alleged must indicate that the seller intended to serve the Texas market.").

In the same way, we conclude that a broadcaster's mere knowledge that its programs will be received in another jurisdiction is insufficient to establish that the broadcaster purposefully availed itself of the benefits of conducting activities in that jurisdiction. Instead, evidence of "additional conduct" must establish that the broadcaster had "an intent or purpose to serve the market in the forum State." *Moki Mac*, 221 S.W.3d at 577.

### d. *Intentionally targeting the Texas market*

Trevino contends that evidence of Petitioners' additional conduct demonstrates that they intended to serve the Texas market with their broadcasts. Relying on *Calder*, Petitioners argue that the evidence does not establish that they intentionally targeted Texas because the subject matter of the allegedly defamatory broadcasts had no relation to Texas and Petitioners did not rely on Texas sources to prepare those broadcasts. We agree that the evidence does not establish targeting under *Calder*'s "subject-and-sources" test, but we do not agree that the subject-and-sources test is the only way to establish that a broadcaster targeted a forum state. Instead, a plaintiff can establish that a defamation defendant targeted Texas by relying on other "additional conduct" through which the defendant "continuously and deliberately exploited" the Texas market. *Keeton*, 465 U.S. at 781. We conclude that Trevino has done so here.

### (1) Subject-and-sources test

The Supreme Court found that the defendants in *Calder* were "not charged with mere untargeted negligence," but instead had "expressly aimed" their actions at California, because their article "concerned the California activities of a California resident" and "was drawn from

22

California sources." 465 U.S. at 788–89. Petitioners rely on three Fifth Circuit cases to argue that, under *Calder*, an allegedly defamatory broadcast targets the forum state *only* if the subject matter of the article involves events in the state and the broadcaster prepared the article by relying on sources in the state. First, in *Revell v. Lidov*, the Fifth Circuit held that "the sources relied upon and activities described in an allegedly defamatory publication should in some way connect with the forum if *Calder* is to be invoked." 317 F.3d 467, 474 (5th Cir. 2002). Then, in *Fielding v. Hubert Burda Media, Inc.*, the court relied on *Revell* for the proposition that "[t]his Court has held that, to exercise specific jurisdiction in a libel action, the 'aim' of the plaintiff under the *Calder* test must be demonstrated by showing that (1) the subject matter of and (2) the sources relied upon for the article were in the forum state." 415 F.3d 419, 426 (5th Cir. 2005) (citing *Revell*, 317 F.3d at 474 & n.48). Finally, in *Clemens v. McNamee*, the court again stated, "We read *Calder* as requiring the plaintiff seeking to assert specific personal jurisdiction over a defendant in a defamation case to show '(1) the subject matter of and (2) the sources relied upon for the article were in the forum state.'" 615 F.3d 374, 380 (5th Cir. 2010) (quoting *Fielding*, 415 F.3d at 426).

We agree with Petitioners that the subject-and-sources test is consistent with *Calder*'s approach to determining whether a defamation defendant "expressly aimed" its communication to a forum state. We also agree that the evidence in this case does not support specific jurisdiction under this test. The subject matter of the allegedly defamatory broadcasts is completely unrelated to Texas. Trevino alleges that Petitioners defamed her by making statements that are almost exclusively about events that occurred outside of and completely unrelated to Texas. Specifically, she asserts the Petitioners:

- "defamed her concerning the very charges of which she had been acquitted";

23

- stated and affirmed "that [she] was a rapist, a murderer, and she would corrupt minors . . . [and] that she had been the lover of a mafia chief";
- reported favorably on a "book and lawsuit against [her and others,] which asserted that they were involved in corruption of minors, kidnapping, and rape";
- "broadcast[ed] allegations that [she] had a daughter in Brazil, that the baby was murdered, and that the body had been dismembered";
- broadcasted allegations that her former jail-mate "was hired as a back-up singer . . . but not paid";
- asserted that she and others "got away with" their misdeeds "because they are delinquents";
- repeated allegations that she "had been diagnosed as having 'dangerous schizophrenia'";
- "promoted claims that Gomez made [her] pregnant when she was in prison and before they were married, calling him 'crazy,' implying that he fabricated a document in order to see [her] in prison, saying he manipulated [her], and accusing him of making death threats";
- made "false statements in which they speculate as to the identity of the father of [her son]";
- "made defamatory statements concerning the way [her son] was conceived"; and
- claimed while covering a fire at the home of her former manager in McAllen in 1999, that "pornography would be found at the scene of the fire."

We agree with Petitioners that these broadcasts did not "concern[] the [Texas] activities of a [Texas] resident," *Calder*, 465 U.S. at 788, or describe activities having a connection with Texas, *Revell*, 317 F.3d at 474, as the subject-and-sources test requires. With the exception of the coverage of the house fire—which occurred in 1999, nearly ten years before the broadcasts about which Trevino primarily complains—and Trevino's assertion that one of the alleged assault victims resides in Texas, all of the statements relate to people and events in Brazil or Mexico. Thus, the evidence does not support a finding of purposeful availment under the *Calder* subject-and-sources test sufficient to make Texas "the focal point" of the broadcasts at issue. *See Calder*, 465 U.S. at 789.

### (2)    Intentional efforts to serve the Texas market

Citing the Fifth Circuit's decision in *Clemens*, Trevino asserts that the subject-and-sources test is only one method of proving that a defamation defendant targeted the forum state, and it need

24

not be met when evidence otherwise establishes that the defendant's statement was "aimed at or directed to" the state. *See Clemens*, 615 F.3d at 380. Petitioners disagree, arguing that "whether the forum state is the focal point of the story is a crucial criterion in determining whether the story is directed at the forum state." We agree with Trevino.

When the Fifth Circuit first articulated the subject-and-sources test in *Revell*, it emphasized "[a]t the outset" that *Calder*'s "'effects' test is but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts with the forum." 317 F.3d at 473 (citing *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001)).[11] Adhering to *Revell* in *Fielding*, the court explained that a plaintiff can establish specific jurisdiction over a defamation defendant by showing *either* "(1) a publication with adequate circulation in the state" under *Keeton*, *or* "(2) an author or publisher who 'aims' a story at the state knowing that the 'effects' of the story will be felt there" under *Calder*. *Fielding*, 415 F.3d at 425. And then in *Clemens*, the court read *Calder* to require the subject-and-sources test, 615 F.3d at 380, but it did not hold that *Calder* established the only test for determining personal jurisdiction over a defamation defendant. *See id.* at 384 (Haynes, J., dissenting) ("[T]he *Calder* effects test is simply an additional, but not exclusive, vehicle for establishing personal jurisdiction over a nonresident defendant who may never have been to the forum state.").

Even if the Fifth Circuit recognized the subject-and-sources test as the exclusive method for establishing personal jurisdiction over a defamation defendant, we would disagree. The test

---

[11] As described above, under the *Calder* "effects" test, a defamation defendant has minimum contacts with the forum state when (1) the state is the focus of the article's "subject-and-sources" and (2) the defendant knew that the "brunt" of the injury would occur there. *See Calder*, 465 U.S. at 788–89 ("California is the focal point both of the story and of the harm suffered.").

determines whether the forum state was "the focal point . . . of the story," which in turn determines whether the defendant purposefully availed itself of the benefits of conducting activities in the state sufficient to establish minimum contacts. *Calder*, 465 U.S. at 788–89. In *Keeton*, the plaintiff had no relevant contacts with New Hampshire, and the offending articles did not address events related to or drawn from sources within that state. 465 U.S. at 772–73. Nevertheless, the Court found minimum contacts because the defendant had "continuously and deliberately exploited the New Hampshire market." *Id.* at 781. We must likewise determine whether Petitioners had "an intent or purpose to serve the market in the forum State." *Moki Mac*, 221 S.W.3d at 577 (quoting *Asahi*, 480 U.S. at 112).

As we have explained, the mere facts that Petitioners' signal reaches into Texas and that Petitioners know it does do not establish that Petitioners purposefully sought to serve the Texas market through their broadcasts. Petitioners cite to evidence to show that is, in fact, not their intent. TV Azteca's contract with Publimax, for example, limits Publimax's right to broadcast TV Azteca's programs like *Ventaneando* only to three Mexican states: Nuevo Leon, Coahuila, and Tamaulipas. Chapoy testified that her programs reported stories deemed appealing to Mexican viewers and that her intended viewership included "primarily Mexican citizens and residents, and not viewers located in the State of Texas." In short, Petitioners' evidence tends to establish that the signals "involuntarily strayed" into Texas as a result of "signal 'spill-over,'" which occurs naturally from the broadcasts in Mexico.

Trevino submitted evidence, however, that Petitioners made substantial and successful efforts to benefit from the fact that the signals travel into Texas, as well as additional efforts to promote their broadcasts and expand their Texas audience. This evidence generally falls into three

26

categories of activities. First, Trevino points to evidence that Petitioners actually physically "entered into" Texas to produce and promote their broadcasts. Between 2005 and 2009, for example, when Petitioners were producing and airing the allegedly defamatory stories about Trevino, TV Azteca had a business office and production studio in South Texas.[12] In 2006–2007, Publimax sent or hired an employee to work in Texas on a project to expand Publimax's broadcasts through cable distribution. Chapoy, meanwhile, traveled to Laredo to promote her books about the *Ventaneando* program (*The Best of Ventaneando* and *The Files of Ventaneando*) and to Dallas to host a live broadcast of *Ventaneando*. While this evidence might not be sufficient on its own, we agree that it is relevant and supports Trevino's allegation that Petitioners purposefully availed themselves of the benefits of conducting activities in Texas.

Second, Trevino points to evidence that Petitioners derived substantial revenue and other benefits by selling advertising time to Texas businesses. As we previously noted, Publimax's website included a map of its viewing market that at least arguably promoted that the stations (which Publimax operates and TV Azteca owns) had over 1.5 million viewers in South Texas. Trevino points to evidence that Petitioners took advantage of this Texas audience as a means to increase their advertising revenue in Texas. For example, the record includes evidence that:

- between 2006 and 2007, TV Azteca hired an advertising agent in McAllen, sent employees to meet with her, and presented advertising packages to her and to Texas businesses to solicit advertising buys on their programs;
- Texans saw advertisements in Texas for Texas businesses on at least one of the TV Azteca/Publimax stations; and
- Publimax and TV Azteca shared almost $2 million in revenue from over a hundred

---

[12] TV Azteca submitted an affidavit stating that it does not currently have a place of business in Texas. Trevino's evidence that TV Azteca previously had a business office and studio in Texas from 2005 to 2009 is not inconsistent with TV Azteca's evidence.

contracts through which Texas businesses purchased advertising time on the TV Azteca/Publimax stations.

And third, Trevino points to evidence that Petitioners made substantial and successful efforts to distribute their programs and increase their popularity in Texas, including the programs in which they allegedly defamed Trevino. For example, Trevino points to evidence that:

- TV Azteca stated in its 2005 annual report that the programs it produces in-house (like *Ventaneando*) are more expensive than those it purchases, and it seeks to offset those production costs by selling its in-house programs outside of Mexico;
- TV Azteca's annual reports reflect that it has made millions of dollars selling its programs and the rights to air its programs internationally, including in the United States;
- TV Azteca gave its wholly owned subsidiary, Azteca International Corporation (AIC), a Delaware corporation headquartered in California that operates as "Azteca America," a content license that permitted Azteca America to transmit some of TV Azteca's programs in the United States;
- *Ventaneando* is "one of the most successful and influential programs in Mexico, the United States, and other Latin American countries";
- AIC has a "library with over 200,000 hours" of TV Azteca's original programming and "news from local bureaus in 32 Mexican states";
- TV Azetca gave AIC a license to use TV Azteca's logo as the logo for Azteca America;
- TV Azteca gave a United States-based satellite broadcaster exclusive rights to distribute the programming of one of the stations that Publimax operates, via satellite;
- Publimax operates TV Azteca's channels under the name "TV Azteca Noreste," which name actually belongs to TV Azteca;
- Publimax agreed to allow another company to retransmit its morning newscast in the United States via satellite;
- Chapoy believes herself to be well known outside of Mexico, including in the United States, because of her work as a journalist;
- Chapoy conducted interviews in the United States and traveled to Texas to promote her books about *Ventaneando* and to promote *Ventaneando America*; and
- Chapoy hosted *Ventaneando America* for AIC on Azteca America when it celebrated the fifteenth anniversary of *Ventaneando*.

Petitioners argue that this evidence, at best, establishes that AIC and other companies intentionally target Texas, but it does not establish that Petitioners themselves have done so. Arguing that the court of appeals erred by relying on the activities and contacts of these other

28

entities to find specific jurisdiction, Petitioners contend that this evidence shows that they have "not afforded [themselves] the benefits and protections of the laws of Texas, but instead [have] calculatedly avoided them." *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002) (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375–76 (5th Cir. 1987)). As we have noted, "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785. And we have "rejected attempts to sue foreign subsidiaries in Texas based on a parent corporation's contacts, holding that jurisdiction over one does not automatically establish jurisdiction over the other." *Spir Star*, 310 S.W.3d at 873.

But the evidence here relates as much to Petitioners' own efforts to target Texas with their broadcasts as it does to AIC's and the other contractors' efforts. To be sure, courts may lack specific jurisdiction over a nonresident defendant who made no independent efforts to purposefully avail itself of Texas and merely contracted with a third party who did. *See, e.g.*, *Zinc Nacional*, 308 S.W.3d at 396 (holding that a Mexican company "using a third-party trucking service to transport its goods through Texas to an out-of-state customer" did not purposefully avail itself of Texas). But a defendant who "intentionally targets Texas as the marketplace for its products" is subject to specific jurisdiction, and "using a distributor-intermediary for that purpose provides no haven from the jurisdiction of a Texas court." *Spir Star*, 310 S.W.3d at 871. We conclude that this evidence would support a finding that Petitioners made substantial and successful efforts to distribute their programs in Texas, not just that they contracted with other companies that happened to have contacts with Texas.

29

We acknowledge Petitioners' evidence that their broadcasts originated in Mexico and were directed primarily at northeastern Mexico and their argument that no evidence suggests that they took steps to direct the signals into Texas or that they reasonably could have stopped that from happening. But whether Petitioners intentionally directed the signals into Texas or not, we must look for evidence that each of the Petitioners took specific and substantial actions to take advantage of the fact that the signals reach into Texas and to financially benefit from that fact. We conclude such evidence exists.

When determining personal jurisdiction, "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790. As the evidence we have listed demonstrates, each of the Petitioners physically entered Texas, sought revenue from Texas, and made efforts to distribute their broadcasts and increase their popularity in Texas. Publimax argues that it did not create, produce, or exercise editorial control over the allegedly defamatory broadcasts, so it cannot be charged with having targeted Texas with defamatory statements. But at this stage of the litigation, the issue is not whether the broadcasts were defamatory (an issue we do not address), but whether Publimax purposefully availed itself of Texas through those broadcasts.

For her part, Chapoy argues that the evidence does not establish her minimum contacts with Texas because she did not control the broadcasts. But the evidence establishes that she personally promoted *Ventaneando* in Texas. Like the editor and reporter who argued in *Calder* that they were "not responsible for the circulation of [their] article in California" and had "no direct economic stake in their employer's sales in a distant State," Chapoy's broadcasts were "expressly aimed" at Texas. 465 U.S. at 790. And there is evidence that she knew that the programs would have a substantial audience in Texas and "the brunt" of Trevino's injury would be felt in Texas.

30

*See Michiana*, 168 S.W.3d at 789 (citing *Calder*, 465 U.S. at 785 n.2) (noting the *Calder* Court's reliance on the fact that the editor and reporter knew their article "was for their employer, the *National Enquirer*, which sold more than 600,000 copies in the forum state every week").

The evidence that Petitioners physically "entered into" Texas to produce and promote their broadcasts, derived substantial revenue and other benefits by selling advertising to Texas businesses, and made substantial efforts to distribute their programs and increase their popularity in Texas supports the trial court's finding that Petitioners "continuously and deliberately exploited the [Texas] market." *Keeton*, 465 U.S. at 781. We thus conclude that the evidence supports the trial court's finding that through their broadcasts, Petitioners purposefully availed themselves of the benefits of conducting activities in Texas, such that they "could reasonably anticipate being haled into court there." *Moncrief Oil*, 414 S.W.3d at 152.

**B.** **"Arising from or related to"**

Because we are addressing the issue of specific—as opposed to general—jurisdiction, we must also determine whether Trevino's claim "arises from or is related to [Petitioners'] purposeful activities in the state." *Id.* at 150. "For specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. A claim arises from or relates to a defendant's forum contacts if there is a "substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585; *see Spir Star*, 310 S.W.3d at 874 (stating same); *Walden*, 115 S. Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

31

This "substantial connection" standard does not require proof that the plaintiff would have no claim "but for" the contacts, or that the contacts were a "proximate cause" of the liability. *Moki Mac*, 221 S.W.3d at 584 ("[T]he but-for relatedness test is too broad and conceptually unlimited in scope, the substantive-relevance/proximate-cause test poses too narrow an inquiry . . . ."). Instead, we consider what the claim is "principally concerned with," *Moncrief Oil*, 414 S.W.3d at 157, whether the contacts will be "the focus of the trial" and "consume most if not all of the litigation's attention," and whether the contacts are "related to the operative facts" of the claim, *Moki Mac*, 221 S.W.3d at 585.

Petitioners contend that, even if the evidence we have described establishes that they purposefully availed themselves of the benefits of doing business in Texas, Trevino's claims are not substantially connected to those Texas contacts. The map showing their Texas viewership, for example, "contains no alleged defamation," and the advertising contracts and revenues from Texas are not "in any way attributable to the subject broadcasts." They thus compare this case to the circumstances we addressed in *Moki Mac*, in which Texas plaintiffs, the Druggs, sought specific jurisdiction over an Arizona outfitter company based in part on the company's advertising of its programs in Texas. 221 S.W.3d at 585–86. The Druggs sued the Arizona outfitter, Moki Mac, after their son, Andy, fell off a cliff and died while on a hiking trip Moki Mac led in Arizona, asserting wrongful-death claims for negligence and claims for intentional and negligent misrepresentation. *Id.* at 573. We held that Moki Mac's Texas advertisements were not substantially connected to the Druggs' claims, because "claims arising out of personal injury that occurs outside the forum do not arise from or relate to a defendant's forum advertising." *Id.* at 586. We concluded that "the injuries for which the Druggs seek recovery [were] based on Andy's death on the hiking trail in

32

Arizona, and the relationship between the operative facts of the litigation and Moki Mac's promotional activities in Texas [were] simply too attenuated to satisfy specific jurisdiction's due-process concerns." *Id.* at 588. Petitioners here argue that, as in *Moki Mac*, Trevino's defamation claims do not arise from or relate to Petitioners' map, advertising contracts, studio, promotional tour, and other Texas contacts.

Petitioners overlook a key distinction between *Moki Mac* and this case. In *Moki Mac*, the evidence of the defendant's Texas contacts was insufficient to support specific jurisdiction in Texas because the "operative facts" of the suit occurred in Arizona. *Id.* at 585. In other words, Moki Mac's "actionable conduct," from which the claim arose, occurred in Arizona, and its "additional conduct" of advertising in Texas did not transform its actionable conduct in Arizona into a contact with Texas. We explained,

> Certainly on a river rafting trip safety is a paramount concern, and we accept as true the Druggs' claim that Andy might not have gone on the trip were it not for Moki Mac's representations about safety. However, the operative facts of the Druggs' suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising Andy. The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question. Only after thoroughly considering the manner in which the hike was conducted will the jury be able to assess the Druggs' misrepresentation claim.

*Id.* at 585.

In *Moki Mac*, the actionable conduct occurred and caused harm outside of the forum state, so the defendant's liability arose from conduct outside of the forum state, not its additional conduct within the state. The plaintiffs' jurisdictional argument thus failed because specific jurisdiction requires the defendant's liability to arise from or relate to its contacts with the forum state. *Id.* at

579. Here, the actionable conduct is the allegedly defamatory broadcasts. Although the broadcasts originated in Mexico, they were received and viewed—and allegedly caused harm—in Texas. Unlike in *Moki Mac*, the actionable conduct at issue here occurred in Texas, so we need not determine whether Trevino's claims arise from Petitioners' additional conduct in Texas.

But the fact that the actionable conduct occurred in Texas is only one stage of the analysis, and it is not enough. For jurisdiction to exist, the actionable conduct within Texas must be conduct through which Petitioners purposefully had contact with Texas and sought some "benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Michiana*, 168 S.W.3d at 785. Thus, unlike in *Moki Mac*, the question here is not whether Trevino's claims arise from Petitioners' additional conduct in Texas (the promotional map, advertising contracts, the promotional tour, etc.), but whether that additional conduct establishes that Petitioners purposefully availed themselves of Texas through their actionable conduct in Texas (the broadcasts). The relevance of the additional conduct, in other words, is not to establish that those contacts constitute Petitioners' minimum contacts with Texas, but to establish that the actionable conduct in Texas itself constitutes minimum contacts.

In this regard, this case is more like the stream-of-commerce cases, in which the court determines whether a seller's placement of its product into the stream of commerce constitutes minimum contacts when the product travels into and causes harm in the forum state. *See, e.g.*, *CSR*, 925 S.W.2d at 595. In those cases, the seller's "awareness that the stream of commerce may or will sweep the product into the forum State" is not enough, and "additional conduct" must indicate "an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112. We expressly acknowledged this principle in *Moki Mac*, and explained, "In determining whether the

34

defendant purposefully directed action toward Texas, we may look to conduct beyond the particular business transaction at issue: '[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State.'" 221 S.W.3d at 577 (quoting *Asahi*, 480 U.S. at 112).

We further noted in *Moki Mac* that "[e]xamples of additional conduct that may indicate whether a defendant purposefully availed itself of a particular forum include advertising and establishing channels of regular communication to customers in the forum state." *Id.* Or, as we listed more thoroughly in *Spir Star*, "[e]xamples of this additional conduct include: (1) 'designing the product for the market in the forum State,' (2) 'advertising in the forum State,' (3) 'establishing channels for providing regular advice to customers in the forum State,' and (4) 'marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.'" *Spir Star*, 310 S.W.3d at 873 (quoting *Asahi*, 480 U.S. at 112). Although this conduct may be "beyond the particular business transaction at issue" (i.e., the allegedly defamatory broadcasts), it is the kind of "additional conduct" that "indicate[s] an intent or purpose to serve the market in the forum State.'" *Moki Mac*, 221 S.W.3d at 577 (quoting *Asahi*, 480 U.S. at 112). The evidence of "additional conduct" here (the advertising, promotional tour, map, etc.) establishes that Petitioners purposefully availed themselves of Texas in connection with their actionable conduct (the allegedly defamatory broadcasts), which occurred and caused harm in Texas. And since Trevino's claims arise directly out of those broadcasts, we hold that the evidence supports the trial court's conclusion that Petitioners have minimum contacts sufficient to support specific jurisdiction in Texas.

## IV.
## Fair Play and Substantial Justice

Even when a nonresident has established minimum contacts with a state, due process permits the state to assert jurisdiction over the nonresident only if doing so comports with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316; *Moncrief Oil*, 414 S.W.3d at 154. Typically, "[w]hen a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts." *Spir Star*, 310 S.W.3d at 872. Thus, "[i]f a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil*, 414 S.W.3d at 154-55.

Nevertheless, we consider several factors to evaluate the fairness and justness of exercising jurisdiction over a nonresident defendant: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Id.* at 155. When the defendant is a citizen of a foreign country, and not just another state, we consider more specifically (6) "the unique burdens placed upon the defendant who must defend itself in a foreign legal system;" (7) the state's regulatory interests; and (8) "the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies." *Guardian Royal*, 815 S.W.2d at 229. "To defeat jurisdiction, [the defendant] must present 'a compelling case that the presence of

36

some consideration would render jurisdiction unreasonable'" *Spir Star*, 310 S.W.3d at 878–89 (quoting *Guardian Royal*, 815 S.W.2d at 231).

Petitioners (and their supporting amici) primarily argue that Texas lacks a constitutionally sufficient interest in providing a forum for the adjudication of this dispute. Specifically, Petitioners argue that Trevino and Gomez are Mexican citizens, and Texas has no interest in this suit by Mexican citizens "against other Mexican citizens over Mexican news broadcasts about Mexican activities." We disagree. Fundamentally, "[a] state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory," *Keeton*, 465 U.S. at 776, and we have never conditioned that interest on the plaintiff's status as a Texas "citizen," as opposed to a Texas "resident."[13] *See, e.g.*, *Moncrief Oil*, 414 S.W.3d at 155 ("[T]he allegations that . . . Defendants committed a tort in Texas against a resident implicate a serious state interest in adjudicating the dispute."); *Spir Star*, 310 S.W.3d at 879 ("Texas has a significant interest in exercising jurisdiction over controversies arising from injuries a Texas resident sustains . . . ."); *see also Asahi*, 480 U.S. at 114 ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished.").

Focusing on the international nature of this dispute and the respective policies of Mexico and the United States, Petitioners and their amici also argue that the exercise of jurisdiction in this case would infringe upon the interests of Mexico, and in turn, place American broadcasters at risk of unreasonable suits in Mexico and other countries. Our decision upholding Texas jurisdiction

---

[13] Petitioners do not contest that Trevino and Gomez resided in Texas at the time of allegedly defamatory broadcasts, but they do argue that Trevino did not prove "that they were lawfully entitled to be in Texas" at that time. We do not consider here whether the legality of Trevino's residency is relevant to our constitutional analysis, as the record does not establish Trevino's immigration status.

over them, they assert, "could well produce undesirable reciprocity, with foreign courts unreasonably exercising jurisdiction over American broadcasters whose over-the-air signals similarly cross national boundaries." And because different countries apply different standards to protect free speech, U.S. broadcasters will "be forced to make editorial decisions and to review programming with an eye to the differing legal standards applicable in other countries, with a clear potential for chilling speech in this country." While we recognize the legitimacy of these concerns, we do not agree that our holding implicates them. We hold that Texas courts have jurisdiction over Petitioners not because their broadcast signals "strayed" and "crossed national boundaries," but because some evidence establishes that Petitioners intentionally targeted Texas with those broadcasts and thereby purposefully availed themselves of the benefits of Texas laws. Requiring nonresidents to comply with the laws of the jurisdictions in which they choose to do business is not unreasonable, burdensome, or unique.

Although Petitioners do not contend that the remaining factors make jurisdiction here constitutionally unfair or unjust, we note that "the international judicial system's interest in obtaining the most efficient resolution of controversies" further supports the exercise of jurisdiction in this case. Petitioners are not the only defendants in this case, and because the other defendants have not challenged the trial court's jurisdiction over them, Texas will host the adjudication of Trevino's claims in this case whether Petitioners are present or not. As we have noted in other cases, adjudicating Trevino's claims against all defendants in one proceeding provides the most efficient means for resolving these disputes. *See Moncrief Oil*, 414 S.W.3d at 155 ("[B]ecause these claims will be litigated with [another defendant] in a Texas court, it promotes judicial economy to litigate the claims as to all parties in one court."); *Spir Star*, 310

S.W.3d at 879 ("[B]ecause the claims against [another defendant] will be heard in Texas, it would be more efficient to adjudicate the entire case in the same place."). We thus conclude that the Texas trial court's exercise of jurisdiction over Petitioners in this case will not offend traditional notions of fair play and substantial justice.

## V.
## Conclusion

Trevino submitted evidence in this case that Petitioners intentionally targeted Texas through their broadcasts that aired in Texas, and Trevino's claims arise from and relate to those broadcasts. Because the evidence supports the trial court's conclusion that Petitioners have minimum contacts with Texas and the exercise of specific personal jurisdiction over Petitioners will not offend traditional notions of fair play and substantial justice, we affirm the court of appeals' judgment and remand this case to the trial court.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: February 26, 2016